736 So.2d 49 (1999)
Richard P. ANDERSON, Appellant,
v.
Evelyn M. ANDERSON, Appellee.
No. 97-2608.
District Court of Appeal of Florida, Fifth District.
May 28, 1999.
*50 Leonard R. Ross, Daytona Beach, for appellant.
Evelyn M. Anderson, Port Orange, pro se.

EN BANC
HARRIS, J.
The issue in this case is not whether the trial judge or the master made the better decision. The issue is whether the trial judge, in rejecting the master's recommendation, applied the correct standard in reviewing the master's report.
In this case, the issue of change of custody of a seven-year-old child was submitted to the jurisdiction of the master as established by Rule 12.490, Florida Family Law Rules of Civil Procedure. This case requires that we determine whether the master is merely a "special court reporter" who takes testimony and then advises a judge who is then free to rule as he or she pleases after viewing the master's report, or whether the master is more akin to an arbitrator who hears the case on the evidence submitted and then makes a decision based on that evidence which decision (in the form of a report) is submitted to a judge for approval or, if there are exceptions for consideration of those exceptions under a "clearly erroneous" standard for facts and an "abuse of discretion" standard for the application of the law to the facts.
The master in this case conducted two days of hearings and compiled a transcript of three volumes and 537 pages. The master made comprehensive findings of fact and concluded that because of the substantial change of circumstances, the best interest of the child would be served by changing custody from the mother to the father.

STANDARD OF REVIEW
Carlson v. Carlson, 696 So.2d 1332, 1333 (Fla. 4th DCA 1997), holds that the appropriate standard of review from a master's report is a limited review. Instead of comparing the master with an arbitrator, however, it compares the role of the reviewing trial judge with that of an appellate court:
As this court noted in Reece v. Reece, 449 So.2d 1295 (Fla. 4th DCA 1984), "the role of the trial court in reviewing the findings and determinations of the master are similar to those of the appellate court in reviewing a trial court's findings and determinations." Because the special master's findings were supported by substantial competent evidence, the trial court properly accepted those findings.
In Lyon v. Lyon, 54 So.2d 679, 680 (Fla.1951), the supreme court discussed the role of the trial court in reviewing a master's findings of fact:
Undoubtedly, where claims are conflicting and the veracity of witnesses is a question to be considered, the master who has seen and heard the witnesses and observed their demeanor while testifying is in a better position than the trial court to pass upon the question of veracity; and this court is committed to the rule that, in this case, the Chancellor should not overturn the findings of the master unless they are "clearly erroneous."
It is clear that if one objects to a master's report, the trial court has an obligation not merely to consider the findings *51 and recommendation of the master but also to review the entire file. But the review is not intended to permit the trial court to make its independent finding of facts or to reach its independent conclusion as to the legal effect of such facts. The review of the entire record is to ascertain whether the master's finding is supported by competent evidence and to see if the master's conclusions pass the Canakaris test.
Other states have adopted a similar standard. See Stephen L.H. v. Sherry L.H., 195 W.Va. 384, 465 S.E.2d 841, 850 (1995) (a circuit court should review findings of fact made by a family law master only under a "clearly erroneous" standard, and it should review the application of law to the facts under an "abuse of discretion" standard); Belknap Textiles, Inc. v. Belknap Industries, Inc., 121 N.H. 28, 424 A.2d 1141 (1981) (although the defendant's evidence supported its position, the plaintiff's evidence also supported its position and there was not such an imbalance in the evidence as to preclude a reasonable person from finding as did the master).
The purpose of reference to a master, particularly in family matters, is to expedite alimony, child support, and custody procedures. The reasons for restricted review are (1) a master is, or should be, experienced in determining the facts in family law cases; (2) duplication of a family law master's efforts by a circuit court would be costly and would contribute only negligibly to the accuracy of the determination of facts; and (3) the parties already have focused their energies and resources on the family law master's determination. Stephen L.H., 465 S.E.2d at 851.
Although the trial court herein recognized its obligation to give "great weight" to the master's report, it proceeded to reweigh the evidence.

FACT FINDING
The court's Order Sustaining Exceptions demonstrates that it failed to accept the master's finding of facts. For example, the master found that "on at least one occasion the minor child reported to State officials that when his mother would smoke crack cocaine she would place a blanket over his bed in the form of a tent so that he was unable to see her. However, the child reported that he was able to see anyway." The master also found: "In the course of executing the search warrant [the business for which the former wife was the office manager was being searched], one officer searched the purse of the former wife and found in the course of the search an attempt by the former wife to dispose of a gray camera pouch which she claimed contained feminine items. Upon opening the pouch the officer found a Coca-Cola can with a hole on the side of the can approximately in the middle of the can that the former wife explained was used by her in smoking crack cocaine. Three additional small plastic bags were found with residue inside which tested positive for cocaine. The officer indicated that the former wife was not arrested for cocaine possession or possession of drug paraphernalia because she was the office manager, was cooperating and explained to the officers that she was afraid that if she was arrested she would lose custody of her son."
The trial court, instead of determining whether these facts were supported by the record, responded to the findings as follows: "[N]ot withstanding the deputy's testimony, [the former wife] was never arrested nor has she been charged for possession of cocaine. The mother flatly denies possessing cocaine. The incident, if it occurred, did not impact upon the child because he had no knowledge of it." Thus, instead of searching the record to see if the master's facts were supported by competent, substantial testimony, the trial judge, without the benefit of having observed the witnesses on the stand, was willing to accept the former wife's testimony over that of the deputy. The judge questions even whether the incident involving the Coca-Cola can occurred. The *52 judge's "finding" that the child had no knowledge of the cocaine use is directly in conflict with the master's finding that the child observed his mother smoke cocaine from the Coca-Cola can even though she covered his bed with a blanket.
The trial judge further stated that although the master relied on the testimony of two witnesses regarding the drug use of the former wife during 1994-1995, the former wife denied it and "neither [of the witnesses] testified that the mother used illegal drugs in her child's presence." Again, this shows that instead of looking for record support for the master's findings, the judge was willing to accept the mother's testimony over the testimony of others even though he was not in a position to judge their relative credibility based on viewing their testimony.
The master found: "The former wife testified that a friend of hers told her that the minor child reported that his father had touched him inappropriately and had pulled his penis. The individual whom the former wife explained was the source of that allegation appeared in court and explained that the incident never occurred and that the former wife had requested that this woman, as a special favor to the former wife, would make allegations in order to assist her in maintaining custody of the minor child." The trial judge responded: "[A]lthough the master finds that the acts alleged ... `never happened', Dustin continues to express fear of his father's discipline to other adults when his father is not present." Here the trial court refused to accept the master's finding of fact, choosing instead to rely on testimony rejected by the master.

APPLICATION OF THE LAW TO THE FACTS
Not only did the trial court apply the wrong standard in reviewing the facts as determined by the master, the trial court also refused to apply the "abuse of discretion" standard to the master's application of the law to the facts.
The master found that "[i]n September, 1995, the former wife attempted suicide by consuming a full bottle of Aleve. At 2:00 a.m. she telephoned a friend and asked the friend to come over and get Dustin because she was not going to be there in the morning. When the friend arrived the former wife was passed out in her bedroom." It seems apparent that the master believed this incident not to be in the child's best interest. The trial court, however, found a silver lining: "The alleged overdose (the judge even refused to accept the finding of the master that it did occur) of Aleve occurred while the child was asleep, and the mother had called other adults to pick him up. Despite what she intended to do, her instinct was still to protect her son." But the standard is abuse of discretion. Could a reasonable "judge" determine that attempting to take one's own life in the middle of the night, leaving alone a seven-year-old son with only the hope that an adult would timely appear to care for him, was not in the child's best interest?
The master also found "the former wife acknowledged that the adult son of her live-in boyfriend held a pillow over her son's head in an attempt to have the minor son stop crying. The incident occurred in October, 1996, and was reported by the minor son as well as confirmed by the former wife. As a result of this incident, the former wife gave the adult son of her boyfriend approximately two weeks to vacate the house." The trial court again found a silver lining: "[N]o medical treatment was ever sought, and the mother promptly banished the boyfriend's son from the home." Did the trial judge interpret "approximately two weeks" as being prompt or did he not accept the finding of the master? Again, could a reasonable "judge" decide that the child abuse committed by the boyfriend's son was serious even though no substantial injuries occurred on that occasion, and that to leave the abuser in the home for an additional *53 two weeks was not in the child's best interest?
The master found: "[S]ince the entry of the Final Judgment of dissolution of marriage the former husband has had limited contact with the minor child. A major reason for this limited contact is the fact that the whereabouts of the former wife and the minor child were not always known to the former husband. The former wife did permit paternal grandparents to visit with the minor child but the former wife warned the paternal grandmother that in the event the residential address of the minor child was ever revealed to the former husband visitation between the minor child and paternal grandparents would be abruptly terminated." The trial court responded: "[D]espite [the father's] repeated statements that he was not permitted visitations, he never asked the court to enforce the visitation he was afforded in the Final Judgment." But could a reasonable "judge," based on the evidence, have concluded that although the father did not appeal to the court for assistance in obtaining visitation, his primary visitation problem was created by the former wife's concealing her whereabouts?
The master found: "[T]he former wife permitted her live-in boyfriend ... to operate a business from the home in which the minor child resided with the former wife and her boyfriend.... The former wife described his business as a pornographic web site." The trial court responds: "No samples of material were presented in evidence. In any event, Dustin had no access to the site and was not present when [the boyfriend] operated it late at night." Could a reasonable "judge" conclude that the operation of a pornographic business out of the home, even when the child is asleep, has a bearing on the "moral fitness" of the caregivers and affects the child's best interest?[1]

CONCLUSION
The master who heard the evidence found:
(1) The mother has a history of cocaine abuse and lied to the police to cover up her drug activities.
(2) The mother made wrongful allegations against the father that he had sexually abused the child and attempted to suborn perjury to corroborate her allegations.
(3) The mother attempted suicide in the early morning hours with the child alone in the house with only the hope that someone would be there for him when she was found in the morning.
(4) The mother interfered with the father's visitation by not revealing her various changes of address and threatened to curtail the visitation of the paternal grandparents if the paternal grandmother revealed the child's address to the father.
*54 The trial court found these findings were offset by:
(1) The fact that the father didn't seek court assistance in making the mother comply with visitation and thus was a "virtual stranger" to his son, and
(2) The father lived with his grandmother and was a recovering alcoholic.
The issue as to whether the master's findings of fact are supported by the record before him is not before us. That is the function, at least initially, of the trial judge. Because the trial judge did not apply the proper standard of review in considering the exceptions to the master's report in that the trial judge reweighed the evidence, made findings of fact from testimony rejected by the master, and substituted his preference as to the custodial parent for that of the master without establishing that the master abused his discretion in finding that the best interest of the child would be served by changing custody, this cause is reversed and remanded for a new review under the appropriate standard of review.
DAUKSCH, COBB, PETERSON and ANTOON, JJ., concur.
THOMPSON, J., dissents, with opinion in which GRIFFIN, C.J., W. SHARP, and GOSHORN, JJ., concur.
THOMPSON, J., dissenting.
I respectfully dissent. I agree with the majority that the issue is "whether the trial judge ... applied the correct standard in reviewing the special master's report." I disagree, however, that the trial court applied an incorrect standard when it rejected the findings and conclusions of the hearing master. Moreover, I do not believe the trial court reweighed the evidence. Rather, the trial court determined that the special master's report was clearly erroneous and that he misconceived the legal effect of the evidence. Both are appropriate bases for rejecting the findings and recommendations of the special master. See, e.g., De Clements v. De Clements, 662 So.2d 1276 (Fla. 3d DCA 1995). In De Clements, the court wrote:
In our analysis of this provision [the applicable rule of procedure], we start from the premise that a Master's findings of fact and conclusions of law come to the trial court clothed with a presumption of correctness, and the trial court may only reject these findings and conclusions if they are clearly erroneous or if the Master has misconceived the legal effect of the evidence presented. (Citations omitted) (emphasis supplied.)
Id. at 1282. See also Bergh v. Bergh, 127 So.2d 481 (Fla. 1st DCA), cert. denied, 133 So.2d 323 (Fla.1961). Based on the facts of this case, the trial court did not err.
This case was before the trial court on the father's supplemental petition for modification of the child custody order in the parties' judgment of dissolution. After an extensive hearing, the special master filed his report. In his report of findings and recommendations, the special master recommended that the trial court change custody of the child from the mother, Evelyn M. Anderson, to the father based on findings of a substantial change in circumstances and that it would be in the best interest of the child. The mother contested many of the findings in her exceptions. The trial judge sustained the mother's exceptions to the report, and ordered that she have continued sole parental responsibility for the minor child, with structured visitation for the father. The trial court entered its order after reviewing the hearing master's report and the mother's exceptions, and conducting a hearing. The trial court's order recognized the conflict in the testimony and noted erroneous findings of the hearing master.
Further, citing Stricklin v. Stricklin, 383 So.2d 1183 (Fla. 5th DCA 1980), and Spradley v. Spradley, 312 So.2d 215 (Fla. 1st DCA 1975), the court wrote that the father had the burden of showing that there was a substantial change of circumstances and that it was in the best interest *55 of the child to change custody, and that a change in circumstances alone would not be sufficient if there was no adverse effect upon the child because of the changes. The court's order noted that the child was doing well in school, had very good attendance the last grading period, and had improved his grades and his behavior. He had received a certificate of achievement for reading and was exhibiting excellent discipline. Counselors testified that the child had adjusted to the school and had fewer problems. A counselor also testified that the child had expressed fear of his father.
As for the father, the court noted that he was living with his grandmother and suffered from alcoholism, although he was in recovery and attending AA meetings. The father was a stranger to the child, visiting only 15 times in two years, and never tried to enforce visitation through a court order. The court also wrote that the father had contributed to the mother's distress because of sporadic child support payments.
This court cites Carlson v. Carlson, 696 So.2d 1332, 1333 (Fla. 4th DCA 1997), to support its premise that the trial court applied the wrong standard. Carlson involved a detailed report from a hearing master on the interpretation of a settlement agreement. The appellate court held that the trial court correctly accepted the master's findings because they were "supported by substantial competent evidence...." Id. If the master's report is supported by competent substantial evidence, then it must be accepted. The converse is also true: failure of the master to provide a written report supported by competent substantial evidence can cause the trial court to reject the report and recommendation. DeClements, 662 So.2d at 1283. The absence of a written report, however, is but one of the reasons for the trial court to reject the master's report. The other reason is that the master misconceived the legal effect of the evidence. DeClements.
The father contends that the court erred in sustaining the exceptions because the master's finding that custody should be transferred was supported by the evidence. Citing Matos v. Matos, 421 So.2d 180, 184 (Fla. 2d DCA 1982), he points out that a trial court does not have the prerogative of substituting its judgment for that of the master. The trial court's role is essentially the same as that of a district court reviewing a trial judge's determinations. Id.
In the instant case, the trial court did not impinge on the master's fact-finding prerogative, but instead determined that the special master had misconceived the legal effect of the evidence. The court was correct in ruling that it must be shown that the change in circumstances has adversely affected the child. See Spradley, 312 So.2d at 216. Further, it is the best interest of the child that controls custody proceedings in general, and immorality is not grounds for a determination of unfitness. See Dinkel v. Dinkel, 322 So.2d 22 (Fla.1975). Therefore, evidence of the mother's boyfriend's defunct Internet pornography business (the only evidence was that it was "soft" pornography and that the child did not have the access code to the computer), the bad check charges, and a civil lawsuit should not have been sufficient to change custody unless there was an adverse effect on the child.
Although there was turmoil in the life of the mother and child, and the turmoil arose at least in part out of her apparent drug use, the only evidence, supported by lab tests, was that the mother had not used drugs for months before trial, that the mother had found a stable environment for the child, and that the child's progress in school delighted the teachers. Against these circumstances are those of the father, about whom mostly nothing is known, except that he has a collection of guns, and that he has not cared about the child enough to visit him, to enforce his visitation rights, or to pay child support on a regular basis. There is no evidence *56 to support the master's finding that he is a "loving, caring, nurturing parent," and the master's determination that custody of this seven-year-old should now be with the father, who had had only sporadic contact with the child, was a misapplication of the law to the facts. Rather, the record supports the trial judge's conclusion that although both parents have social and economic deficiencies, the father is not a caring parent. The master's recommendation might have been sustainable if it had been an initial custody determination, but since it was a recommendation for modification, the court correctly rejected it. Schweinberg v. Click, 627 So.2d 548 (Fla. 5th DCA 1993); Vazquez v. Vazquez, 626 So.2d 318 (Fla. 5th DCA 1993).
GRIFFIN, C.J., W. SHARP, and GOSHORN, JJ., concur.
NOTES
[1] This "what the child can't see can't harm him" principle of domestic law perhaps started with Dinkel v. Dinkel, 322 So.2d 22, 23-24 (Fla.1975), which held in a case in which a parent had committed adultery in the home but not in the presence of the child:

Adultery may or may not have a direct bearing on the welfare of a child of tender years. Engaging in sexual intercourse with someone other than one's spouse in the same household where the subject child is present does not necessarily affect the child's welfare.
Dinkel left open the question of whether as the child grows older and becomes aware of the non-marital sexual relationship of the parent, his or her welfare may be affected even though he or she does not see the act. Dinkel left it to the trial court to determine whether such adulterous relationship affects the welfare of the child.
Now we must decide whether this out of sight, out of harm principle should be extended to even the caregiver's use of illegal drugs or dealing in home-based pornography. Does not such conduct evince contempt for the law, disrespect for women and disregard for committed relationships and thus permeate the environment where the caregiver lives whether or not the child "sees it"? Morality is important; character does count in custody determinations. Children learn attitudes, good and bad, by osmosisobservation and emulation.