740 So.2d 1153 (1998)
Robert S. YOUNG, Appellant,
v.
Alice G. HECTOR, Appellee.
No. 96-2847.
District Court of Appeal of Florida, Third District.
June 24, 1998.
Opinion Granting Rehearing July 14, 1999.
Rehearing Denied September 1, 1999.
*1154 Barbara Green, Coral Gables; Ellen Lyons, Miami, for appellant.
Young, Berman, Karpf, and Burton Young, and Andrew S. Berman, Miami Beach; Hector and Harke, and Lance A. Harke, Miami; Amy D. Ronner, Miami, for appellee on rehearing.
Before SCHWARTZ, C.J., and NESBITT and GODERICH, JJ.
Opinion Granting Rehearing En Banc July 14, 1999.
PER CURIAM.
This is an appeal from a final judgment of dissolution of marriage. We reverse and remand for further proceedings.
The record indicates that the parties were married in New Mexico in February 1982. The parties have two daughters, Baylor, who was born in 1985, and Avery, who was born in 1988. Since the children were born, the parties have always had either a live-in nanny, au pair, or housekeeper, who has helped care for the children.
At the time of their marriage, one spouse, an architect, was involved in several business ventures, including a publishing company and a custom-home building firm. The architect was very successful until the stock market crashed in October 1987.
The other spouse was an attorney, who, at the time of the parties' marriage, had a law firm. The attorney's income would vary somewhere between $30,000 and nearly $100,000 per year.
After the parties' youngest child was born, the parties discussed a possible relocation to Florida. The architect told the attorney that if the attorney could find a job in Miami, the architect would be willing to relocate. In 1989, the attorney found employment at a prestigious, mid-sized law firm earning approximately $120,000 per year. Shortly thereafter, the attorney and the children relocated to Miami, while the architect remained in New Mexico for six months to finish several projects and to sell the parties' home. In the summer of 1992, the architect returned to New Mexico for approximately 14 months to direct a treasure recovery project. During the 14-month period, the children remained in Miami with the attorney, but the children visited with the architect approximately every five weeks.
In the fall of 1993, the attorney, who by this time was earning approximately $275,000 with the mid-sized law firm, accepted a shareholder position at one of Florida's largest law firms earning over $300,000 per year. Shortly after the attorney accepted the position with the new firm, the architect returned to Florida. Upon the architect's return, the parties separated although they both continued to live in the marital home. The attorney filed for divorce in May 1995.
At trial, the court accepted evidence relating to alimony, child custody, and the equitable division of the marital assets and liabilities. The evidence included the testimony of the parties, neighbors, friends, the children's teacher, school counselor, and the managing partner of the law firm where the attorney is currently employed.
The attorney testified that when the attorney is involved in a trial, the attorney works approximately 12 to 14 hours per day, six to seven days per week. On the *1155 other hand, when the attorney is not in trial, the attorney works 45 to 50 hours per week. Moreover, during the past two years, the attorney has had several cases that have required the attorney to travel to Central Florida. When traveling, the attorney would either leave Miami very early in the morning and return late at night, or would stay in Central Florida overnight. The cases that required the attorney to travel to Central Florida have been settled, and the attorney's remaining cases will no longer require the attorney to travel outside of Miami. In addition to the attorney's employment at the law firm, the attorney also teaches at a law school.
The managing partner gave deposition testimony stating that the attorney is a senior litigation partner and is responsible for major cases. The managing partner also testified that it is "very easy" to accommodate family problems when an attorney works in the corporate or real estate department, but that it is "very difficult" to accommodate family problems when an attorney works in the litigation department. Further, he stated that the average litigation partner works 10 to 11 hours per day, and that litigators cannot work only eight hours per day, five days per week.
The parties testified that except for a few small remodeling jobs, the architect has been unemployed for approximately six years. After the architect moved to Miami, the architect attempted to find employment, but was unsuccessful. The architect lacks the computer skills that are needed to find employment as an architect in the present job market. The architect testified that both University of Miami and Florida International University have a two-year masters program that will teach the necessary computer skills.
The record demonstrates that since returning to Miami in the fall of 1993, the architect has been very dedicated to the children. For example, the architect started and led one of the children's Brownie troop, coached one of the children's soccer team, regularly volunteered at the children's school, and takes the children to doctor and dentist appointments.
At trial, the guardian ad litem's report was introduced into evidence, and he also testified at trial. In his report, the guardian ad litem recommended that the attorney be designated the primary residential parent and that the architect be granted very liberal and frequent access to the children. The report states that the architect is "warmer" and "phenomenal" with the children, and that the attorney "tends to be somewhat cooler by nature, but consistently spends time with the children and makes a point out of doing things with them on weekends and when [the attorney] is available evenings." The guardian ad litem also found that since the parties have been living in Miami, the architect "has been the dominant caretaker during the day, and [the attorney] on weekends, although both pitch in as needed." The guardian ad litem testified that he looked at three "determinative factors" in recommending that the attorney be named the primary residential parent. First, the attorney has been more economically stable throughout the marriage. Second, the attorney has been "the more constant factor throughout the entire relationship. There have been times in the children's life when [the architect] has been, for whatever reasons, away from the home for substantial periods of time and [the attorney] has been the dominant influence." Third, the attorney "controls [anger] better around the kids."
Isabel Singleton, a neighbor and family friend, testified that the architect pays attention to detail, is very goal-oriented, and very caring. She also stated that the attorney is involved in the children's activities, plays with the children, takes them to the movies, the beach, and the zoo, and brings out their self-expression. Further, she testified that the attorney is usually available on weekends and that the attorney's work has not interfered with the ability to be a good parent.
*1156 Laura Mirabito, another neighbor and family friend, testified that the architect has a very close relationship with the children, coaches the soccer team, picks the children up from school, coordinates the children's play dates, and participates in school activities. On the other hand, she testified that the attorney is the one who coordinates the sleepovers, and that the attorney is at home on the weekends and in the evenings.
Keith Chasin, who coached in the same soccer club as the architect, testified that the architect interacts with the children well and is a good coach. He also stated that he has never met the attorney.
Joan Hamel, the mother of one of the children's best friend, testified that the architect gets to the children's school functions early and videotapes the children. On the other hand, she stated that she once saw the attorney arrive late and read law books during the performance. Further, the architect is the one who usually picks up the children from her house; the attorney has only picked up the children approximately three times in the last four years. She testified that the architect is one of the few parents who stays at parties that the children attend. Moreover, the architect is the one who leads the Brownie troop, and at one meeting, one of the parties' children stated that the attorney is never home and does not read the Brownie's paper. Further, she described the architect as a "devoted" parent. Finally, she stated that all the children in the Brownie troop, including the parties' children, "adore" the architect.
Dulce del Castillo, one of the children's former pre-school teachers, testified that the architect constantly volunteered at the school. For example, the architect made repairs to the classroom, attended field trips, and participated in cooking and art activities. Whereas, the attorney's involvement was limited to dropping the children off at school eight to ten times during the school year.
Lynn Drittel, a school counselor, testified that the architect involved the children in the school's divorce group. Further, when she sent home questionnaires, only the architect's questionnaire was returned. Finally, she stated that the architect volunteered for the second grade self-esteem program.
David Harper, a fellow parent and sports coach, also testified. He stated that the architect is a good parent, a good caretaker, patient with the children, and involved in the children's daily activities. He also testified that the attorney was involved in the parent-child soccer games, even though the games were played in the early afternoon. The attorney also attended the Saturday games and the parent-child program. Further, he stated that the architect was the caretaker on a daily basis, but that the attorney was available and that the children responded well to the attorney.
Finally, Carol Lumpkin, who is a neighbor and family friend, testified that both parents are loving and caring parents, and that both have a lot to offer the children.
After evaluating the relevant statutory factors of section 61.13(3), Florida Statutes (1995), the trial court awarded primary residential custody of the children to the attorney, with frequent and continuing contact with the architect. The final order also provides that "for one year within five years of entry of this Final Judgment but not sooner than 2 years of entry herein of, primary physical residence of the children shall be with the [architect]." The trial court denied the architect's request for permanent alimony, but granted the architect four months of rehabilitative alimony at $2,000 per month. The trial court also distributed the parties' marital assets and debts. Finally, the architect was awarded $10,000 in attorney's fees. The architect appeals from this final judgment.
The architect contends that the trial court abused its discretion by granting primary residential custody of the children to the attorney. We agree.
*1157 A trial court's determination of custody "is subject to an abuse of discretion standard of review." Sullivan v. Sullivan, 668 So.2d 329, 330 (Fla. 4th DCA 1996)(citing Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980)). An appellate court must affirm if there is substantial competent evidence to support the trial court's finding that the custody award was in the best interests of the child. See Duchesneau v. Duchesneau, 692 So.2d 205, 206 (Fla. 5th DCA 1997); Cherradi v. Lavoie, 662 So.2d 751, 753 (Fla. 4th DCA 1995); Gardner v. Gardner, 545 So.2d 339, 340 (Fla. 4th DCA 1989); Quirino v. Quirino, 459 So.2d 1183 (Fla. 3d DCA 1984).
A trial court's decision as to which parent should be awarded primary residential custody of the children should attempt to preserve and continue the caretaking roles that the parties had established. Such a continuation would clearly be in the best interests of the children. The American Law Institute has addressed this issue in its Illustrations:
Gary and Nancy have three children, ages 12, 9, and 3. Gary is a high-school graduate and Nancy, a veterinarian. For the first four years after their first child was born, Gary worked outside the home and Nancy was the primary caretaker of the children. When their second child was one year old, they decided to switch roles because of Nancy's greater earning capacity. After eight years of this arrangement, Gary and Nancy separated. Each wants primary custodial responsibility for the children. Nancy argues that since she gave up being the primary caretaker for the benefit of the family and not because of personal preference, Gary should not be favored ... based on his larger caretaking role.
Nancy's fairness argument is irrelevant to how custodial responsibility should be allocated.... The court should allocate custodial responsibility based on the parents' past caretaking roles.
Principles of the Law of Family Dissolution: Analysis and Recommendations, Tentative Draft No. 3, Part I, American Law Institute, § 2.09, at 121 (1998).
In the instant case, the trial court's award of primary residential custody of the children to the attorney has the effect of not continuing the caretaking roles that the parties had established. It is clear from the record that it is the architect who is available to the children after school, takes the children to the doctor and dentist appointments, and actively participates in the children's school and after-school activities.
Moreover, the guardian ad litem's testimony indicates that one of the "determinative factors" in recommending that the attorney be designated the primary residential parent is that the attorney has been more economically stable throughout the marriage. In light of the child support guidelines, a parent's financial resources (or lack of) should not be a "determinative factor" in deciding which parent should be the primary residential parent. Principles of the Law of Family Dissolution: Analysis and Recommendations, Tentative Draft No. 3, Part I, American Law Institute, § 2.14, at 250 (1998). A parent's financial resources is only one factor that must be balanced with the remaining statutory factors outlined in section 61.13(3), Florida Statutes (1995). When balancing the statutory factors, the fact that one parent is the primary caretaker should always outweigh the fact that the other parent is more financially stable. The record in the instant case clearly indicates that the architect, although not as financially fortunate as the attorney, has always, as the primary caretaker, provided the children with food, clothing, shelter, and medical attention. The record clearly indicates that the architect, with an adequate amount of child support, would continue to provide for the children.
Moreover, the guardian ad litem's recommendation was also based on the fact that architect has been "away from the *1158 home for substantial periods of time and [the attorney] has been the dominant influence." Under the circumstances of this case, the fact that architect was away from the home prior to the separation should not be a "determinative factor" where the architect has continually been the primary caretaker since the fall of 1993.
Therefore, after reviewing the record, including the testimony of the parties and other witnesses, we find that the trial court abused its discretion by awarding primary residential custody of the minor children to the attorney. However, on remand, the trial court should grant the attorney liberal and frequent access to the children.
Finally, the award of alimony to the architect was inadequate in light of the rehabilitative plan presented by the architect and the lifestyle established during the parties' marriage, Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980), the distribution of the parties' assets and liabilities was inequitable, and the award of attorney's fees to the architect was insufficient. On remand, the trial court should revisit these issues along with the issue of child support, especially in light of this Court's disposition as to primary residential custody. Therefore, we reverse these awards and remand for further proceedings, including evidentiary hearings, if necessary.
Reversed and remanded.
Before SCHWARTZ, C.J., and NESBITT, JORGENSON, COPE, LEVY, GERSTEN, GODERICH, GREEN, FLETCHER, and SORONDO, JJ.[*]

ON REHEARING EN BANC
GREEN, J.
Upon our rehearing en banc of this cause, we withdraw the prior panel opinion issued on June 24, 1998 and substitute the following opinion in its stead.
The former husband/father (Robert Young) appeals from the final judgment of dissolution of marriage. We affirm the trial court's decision designating the former wife/mother (Alice Hector) as the primary custodial parent of the two minor children but reverse and remand the court's determination as to rehabilitative alimony, distribution of the parties' assets and liabilities and attorney's fees for further proceedings.
The father's main contention on this appeal is that the trial court abused its discretion when it awarded custody of the minor children to the mother. We do not agree. After laboriously reviewing all of the record evidence in this case, we conclude that there was substantial competent evidence to support the trial court's discretionary call in this regard. Thus, there is no basis for us to overturn the lower court's decision.
As we see it, the child custody issue in this case, with all its attendant notoriety, centers only around our standard of review as an appellate court. The simple issue for our consideration is whether the trial court abused its discretion when it determined that the best interests of the two minor children dictated that their mother be designated their primary custodial parent. See Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980); Grant v. Corbitt, 95 So.2d 25, 28 (Fla.1957); Sullivan v. Sullivan, 668 So.2d 329, 329-30 (Fla. 4th DCA 1996). If there is substantial competent evidence to support the trial court's determination, it is firmly established that a trial court cannot be deemed to have abused its discretion and its ruling must be left undisturbed on appeal. See Canakaris, 382 So.2d at 1203; Dinkel v. Dinkel, 322 So.2d 22, 24 (Fla.1975); Bader v. Bader, 639 So.2d 122, 124 (Fla. 2d DCA 1994) (en banc); Jones v. Jones, 633 So.2d 1096, 1099 (Fla. 5th DCA 1994); Ross v. Ross, 321 So.2d 443, 444 (Fla. 3d DCA 1975). Appellate courts are never permitted to retry a court's determination in this regard de novo or reweigh the evidence. *1159 See Reinhart v. Reinhart, 291 So.2d 103, 105 (Fla. 1st DCA 1974) (stating "[i]t may well be that were we permitted to hear the case de novo we might enter a different final judgment. However, such is not our prerogative."); see also Miller v. Miller, 371 So.2d 565, 566 (Fla. 4th DCA 1979) (holding that appellate court may not substitute its judgment for that of trial judge).
At the outset, it is important to emphasize that both the mother and father are very loving and capable parents. Nobody disputes this fact, which alone made the trial court's determination all the more difficult. What then tilted the scales in favor of awarding custody to the mother? The father suggests that it was gender bias. The record evidence, however, simply does not support this suggestion.

I
At the time of their marriage in 1982, both the father and mother were successful professionals in New Mexico. He was an architectural designer with his own home design firm as well as an entrepreneur with a publishing company. She was an attorney in private practice at her own firm. Their marriage was a second for both. He had no children from his first marriage. She had custody of her two minor children (now grown) from her first marriage which she successfully reared while simultaneously juggling the demands of her law practice.[1]
Hector and Young became the parents of two daughters born in 1985 and 1988. After the birth of their children, both parents continued to work outside of the home and pursued their respective professional endeavors with the assistance of a live-in nanny, au pair, or housekeeper. As typical working parents, they would both arrive home between the hours of 5:30 and 6:00 each evening. Both contributed to and shared in the household expenditures at all times.
Sometime in late 1987, the father's business ventures began to suffer certain financial reversals and the mother became bored with her practice in New Mexico. Both parties agreed to relocate to Miami. Although there is a complete conflict in the record between the parties as to who broached the subject of the couple's relocation to Miami and the circumstances under which they would relocate in terms of their respective careers, it is significant that neither of these parties ever testified that they ever agreed or expected the mother to pursue her legal career while the father remained at home as the full-time caregiver to their minor children. To the contrary, the father actively pursued job leads in the Miami area prior to the couple's relocation.
In June 1989, the mother and her two minor daughters arrived in Miami first. During that summer, she studied for and took the Florida Bar exam and landed a position with a mid-sized law firm. The father stayed behind in New Mexico until October 1989 in order to complete the construction of a new house and to remodel the couple's New Mexico home in order to enhance its resale potential.
After the father's move to Miami in the fall of 1989, he studied for and passed the Florida contractor's examination. Thereafter, during the spring and summer of 1990, the father spent his time repairing the couple's first marital residence in Miami. Thereafter, he renovated the home which ultimately became the couple's second marital residence. It is significant to point out at this juncture, that it is undisputed that from the time the minor children were brought to Miami in 1989 until the fall of 1993, the needs of the minor children were attended to by a live-in housekeeper when they were not in school during the day and by the mother upon her arrival from work in the evenings.
After the father's renovations to the couple's second Miami residence were completed *1160 and the family moved in, the mother testified that she began to have serious discussions (which eventually escalated into arguments) about the father's need to find gainful employment. Although the mother was earning a very decent income as an attorney at the time, it was undisputed that this family was operating with a negative cash flow.
Rather than pursue gainful employment to financially assist the household and his minor children, the father turned his attentions elsewhere. During the remainder of 1990 through 1993, the father left the state and was frequently away from the mother and minor children for months at a time. During this time, he returned to New Mexico to attend to lingering matters involving his prior businesses there and to make preparations for an upcoming treasure hunt. He also visited his sick brother in Arkansas and later handled his brother's estate matters upon his brother's demise. During this time, the father spent approximately fourteen months away from his family pursuing buried gold in New Mexico on a treasure hunt. The minor children were continuously being cared for by the housekeeper/babysitter during the day and the mother after work. The father saw his family during this fourteen month period once every five weeks and according to the mother, only at her insistence and pursuant to her arrangements for such family reunions.
When the father finally returned to South Florida, in the fall of 1993, the mother had accepted a partnership position with a large Florida law firm at a salary of approximately $300,000 annually. Even with the mother's salary increase, the family remained steep in debt. At that time, the couple no longer had a live-in nanny or babysitter for the children. The children were in a public school full-time between the hours of 8:30 a.m. and 2:00-3:00 p.m. The mother had employed a housekeeper ("Hattie") who came to the house each weekday between the hours of noon and 8:00 p.m. to clean, pickup and babysit the children after school. The mother's time with the children during the weekdays consisted of her awakening, dressing, and having breakfast with them prior to transporting them to school, and spending the early evening hours with them prior to their bedtime. The mother engaged in activities with the children on a full-time basis on the weekends. When the children became ill or distressed during the middle of the night, the mother was always the parent they looked to for assistance or solace.[2]
Approximately one month after the father's return to the household in 1993, the mother asked the father for a divorce because of his continued refusal to seek gainful employment and due to his extramarital affair in New Mexico. It must be reemphasized that at no time did the mother and father have any mutually expressed or tacit agreement for the father to remain unemployed. The father candidly conceded as much at trial.[3] Consequently, this case simply did not involve the typical scenario where two spouses, by mutual agreement, agreed for one to remain at home to care for the children and the other spouse to work outside of the home.
*1161 Once the mother announced to the father that she wanted a divorce, the father began to spend less of his time away from Miami. Although he steadfastly refused to make any efforts to obtain employment, he did become more involved in the activities of his two daughters, who by that time, were 8 and 5. Since both girls were in school full-time at this time, the father's involvement with the girls' activities occurred primarily Mondays through Fridays between the hours of 3:00 p.m. and 6:30 p.m., prior to the mother's arrival from work. Upon the mother's arrival at the home, the father generally absented himself.[4]
The father nevertheless maintained that he was the "primary caretaker" or "Mr. Mom" of these two children in the three years preceding this dissolution proceeding. The trial court viewed this contention with some degree of skepticism as it was entitled.[5] The trial court's skepticism or disbelief was not at all unreasonable, given the father's admission that the nanny, Hattie, had taken care of these children in large part during the afternoon hours until their mother's arrival at home. The father's concession is what prompted the court to ultimately make inquiry as to why the father did not seek employment or alternatively, why there was a need for a full-time nanny:
* * * *
[Father's attorney]: Who picks the kids up?
[Father]: Either Hattie or I. Typically, it's me. If I am tied up, whether it's a meeting or whatever, or if I go somewhere like your office, way up in North Miami Beach, and I don't get back in time and I thought I would, I can call Hattie and say, "Hattie, please pick up the children." She does. She picks them up frequently.
[The Court]: Is Hattie there five days a week?
[Father]: Yes sir. She comes at noon every day. She cleans the house in the afternoons. She prepares the dinners. The kids eat. We eat. I eat with the children every day typically at 6:30. She cleans up after that.
She'll draw a bath for Avery and she leaves at eight o'clock in the evening five days a week.
[The Court]: Maybe I'm missing something. Why don't you get a job.
[Father]: Well, because my background is architecture. That's my degree, but when I graduated, they did not have computers. Today, it's computer dominated and I'm computer illiterate.
I, in talking to Larry Foreman, who was court appointed as the career consultant, anticipated that I should go to graduate *1162 school to acquire these skills that I'm lacking right now.
I've gone on interviews. They like me. They like what I have to offer but their offices are basically all computerized.
Previously, because of the number of hours Ms. Hector worked, I filled in. Ms. Hector has a secretary that handles her whole life at the office and in a sense I was the secretary that handled her whole life at home and took care of the children.
[The Court]: But you've got a nanny doing that.
[Father]: No sir, I don't believe you can buy parents. Nannies can pick up. They can drop off.
[The Court]: Why [sic] do you need the nanny for, if you're there doing it?
[Father]: She cooks. She cleans. I could do a lot of that. Typically, people that have incomes of over a quarter of a million dollars or $300,000 can afford the luxury of having help, hired help.
I am not the kind of person that sits around and watches soap operas. I try to do meaningful, worthwhile things.
[The Court]: Go ahead, counsel.

* * * *
Contrary to the father's suggestion on appeal, this inquiry by the court is not evidence of gender bias. Given the undisputed large financial indebtedness of this couple, the trial court's inquiry about the need to employ a full-time nanny was both logical and practical under these circumstances and certainly could have also been appropriately posed to the mother if she had been recalcitrant about seeking gainful employment to assist the family's financial situation.[6]

II
Apart from this evidence, the court also had the report and recommendations of the guardian ad litem upon which to rely. In recommending that the mother be named the primary custodial parent, the guardian ad litem cited three factors, all of which we find are supported by competent substantial evidence in the record. First of all, the guardian noted that the mother had been the more economically stable of the two parents throughout the marriage. We do not believe that the guardian gave the mother the edge simply because she earned a large salary. We believe, that what the guardian was attempting to convey was that the mother had shown a proclivity to remain steadily employed, unlike the father who unilaterally removed himself from the job market, although he was employable and the family needed the additional income. The trial court concluded that the father was "where he is largely because of his own choice." The trial court was obviously not oblivious to the fact that the father was also a Florida licensed contractor who had built homes in New Mexico and renovated both of the parties' Florida marital residences. Given the father's skills and experience, the trial court was certainly entitled to reasonably conclude that the father was employable upon his return to Miami in 1993one year after Hurricane Andrew literally destroyed thousands of residences and commercial establishments in South Dade County and building contractors were in heavy demand. Given a choice between the mother, who maintained constant steady employment throughout the marriage to support the children (regardless of the amount of her income), and the *1163 father who unilaterally and steadfastly refused to do the same, the trial court's designation of the mother as custodial parent cannot be deemed an abuse of discretion.[7]See § 61.13(3)(c), Fla. Stat. (1995).
The second factor relied upon by the guardian ad litem in recommending that the mother be declared the primary custodial parent was the fact that the mother had been a constant factor and dominant influence in the children's lives and the father had not. The guardian ad litem observed:
There have been times in the children's life [sic] when Bob has been, for whatever reasons, away from the home for substantial periods of time and Alice has been the dominant influence.
More recently, while she has been working, he has been available at home more hours of the day than she has been, but over a continuum of time, I believe that her presence has been a more steady presence in the sense of available almost the same time for the kids throughout the relationship, whereas Bob has been intensely absent and intensely present.
In its determination as to the best interests of the minor children, the trial court obviously deemed it more important to assess the children's time spent with each of the parents throughout the course of the marriage and not merely focus on the years immediately preceding the announcement of the dissolution action. That is, the trial court, in an effort to maintain continuity, could have legitimately determined that the children's best interests dictate that they remain with the parent who had continuously been there to care for their needs throughout their young lives rather than the parent who had devoted a substantial amount of time with them perhaps only when it was convenient and/or opportunistic to do so. See § 61.13(3)(d), Fla. Stat. The record evidence clearly supports the trial court's conclusion that the mother had been the constant parent throughout the children's lives. Thus, there was no basis for the panel to overturn the trial court's finding in this regard.
The last factor cited by the guardian ad litem, which tilted the scale in favor of the mother, was the mother's superior ability to control her anger around the children. The guardian ad litem testified that he personally witnessed one of the father's outbursts of anger in the presence of the children. For that reason, the guardian, who is also a retired circuit court judge, went so far as to recommend that the father receive anger control counseling.
Given this substantial competent evidence in the record, we cannot conclude that the trial court abused its discretion when it awarded custody of the minor children to their mother. Nor can we conclude that the court's determination was impermissibly influenced by gender bias against the father.
Custody determinations are perhaps the most sensitive and delicate decisions that family court judges make. We *1164 recognize that at times, it can be a very difficult and agonizing call for the trial judge to make when both parents are as loving and caring as the mother and father are in this case. Nevertheless, once the trial court makes this decision and the decision is supported by substantial competent evidence, we recognize that the trial court's determination should not be lightly second-guessed and overturned by an appellate court merely reviewing the coldnaked record. Indeed, the trial court has the unique advantage of meeting both parents prior to making its decision. Thus, the trial court, unlike an appellate court, is entitled to rely, not only upon the record evidence presented, but upon its mental impressions formed about each of the parents and their respective parenting strengths and weaknesses. Moreover, trial judges sitting as triers of fact in these proceedings are not required to shed their common sense and life's experiences when they don their black robes to preside over these proceedings. As long as the trial court's decision is supported by substantial competent evidence and is not based upon legally impermissible factors such as gender bias, it must be affirmed on appeal. For this reason, we affirm the order awarding primary residential custody of the minor children to the mother. However, on remand, the trial court should grant the father liberal and frequent access to the children.

III
Finally, we agree that the award of alimony to the father was inadequate in light of his rehabilitative plan presented to the court and the lifestyle established during the parties' marriage. Canakaris, 382 So.2d at 1201-05. Moreover, the distribution of the parties' assets and liabilities was inequitable and the award of attorney's fees to the father's lawyer was insufficient. On remand, the trial court should revisit these issues. Thus, we reverse these awards and remand for further proceedings, including evidentiary hearings, if necessary.
Affirmed in part and reversed and remanded in part.
JORGENSON, COPE, LEVY, GERSTEN, FLETCHER and SORONDO, JJ., concur.
LEVY, Judge (specially concurring).
I endorse and agree with the majority opinion. I write separately only to express my strongly held view that, despite all that has been said about the peripheral implications of this case, the reality is that the pivotal issue involved in this case can, and must, be resolved by going through the simple exercise of examining the trial court's decision according to the appropriate standard of review that this Court must follow.
Simply put, there is more than substantial competent evidence to support the trial court's decision to name the mother as the primary residential parent of the children in this case. Furthermore, the record does not reflect any abuse of discretion by the trial court in reaching that decision.
While there is probably also an appropriate quantum of evidence that would have supported naming the father as the primary residential parent, the trial court, after hearing and weighing all of the evidence, determined that it was in the best interest of the children to name the mother as the primary residential parent.
Clearly, this Court cannot second-guess the decision of the trial court as, I respectfully suggest, the original panel opinion did. Rather, as stated above, this Court's function is limited solely to reviewing the decision of the trial court in light of the appropriate standard of review.
The record in this case is replete with "substantial competent evidence" that supports the decision of the trial court. Such evidence includes the testimony of the Guardian Ad Litem, the mother of the children, several neighbors of the parties, as well as the father himself. The following is a summary of various portions of the *1165 record that support the trial court's decision:
Ira Dubitsky (Guardian Volume V. of Record, Referring to custody:
Ad Litem)("GAL") Page 23, Lines 22-25 Q: "And what was your recommendation, sir?"
 and
 Page 24, Lines 1-6 of A: "That the primary residential responsibilities
 Transcript. for the children should be with Alice; that
 Bob should have extremely liberal access to the
 children, including daily contact, and that I feel
 it's extremely important that the two parties
 remain in close proximity to one another physically,
 because I think that each of them brings
 something completely different to the table, both
 of which gives a tremendous amount to the
 kids."
 Volume V. of Record, Describing the basis for his recommendation
 Page 25, Lines 14-25 and that primary residential custody be given to
 Page 26, Lines 1-4 of Alice Hector, the "GAL" stated:
 Transcript.
 "... Number one, very clearly, she has been the
 more economically stable of the two throughout
 the relationship.
 Number two, she has been, I think, the more
 constant factor throughout the entire relationship.
 There have been times in the children's
 life when Bob has been, for whatever reasons,
 away from the home for substantial periods of
 time and Alice has been the dominant influence
 ... over a continuum of time, I believe that her
 presence has been more steady presence in the
 sense of available almost the same time for the
 kids throughout the relationship, whereas Bob
 has been intensely absent and intensely present."
 Volume V. of Record, "... each of the parties harbors a good deal of
 Page 26, Lines 15-19 of anger towards the other and what is apparent to
 Transcript. me objectively is that they handle the anger
 differently. Alice controls it better around the
 kids."
 Volume V. of Record, "When you listen to him [the former husband]
 Page 32, Lines 13-16 of talk about her, she's the greatest lawyer in the
 Transcript. world and each of them acknowledges that the
 other is very good with the kids and so on and so
 forth."
 Volume V. of Record, A: "Certainly, Alice has pretty consistently
 Page 37, Lines 7-13 of been available on weekends, and the beauty of
 Transcript. the situation, as far as I'm concerned, has been
 the existence of Hattie [the parties' housekeeper],
 who has been a very stable influence and
 fills a role that you have in many homes where
 you've got two working parents, which is that
 she takes up the slack."
 Volume V. of Record, Q: "As a final question, your recommendation,
 Page 39, Lines 5-15 of according to your report, is that the children
 Transcript. would be best off with Ms. Hector as primary
 residential parent, as the situation exists today,
 obviously."
 A: "Yes."
 Q: "Is it implied in that recommendation that
 Mr. Young is also capable and suitable as a
 residential parent?"
*1166
 A: "Absolutely. This is one of the situations
 where whatever the judge rules, as far as I'm
 concerned, the kids are going to do fine."
Alice Hector (mother). Volume V. of Record, "I'm actively involved in their education. I
 Page 46, Lines 21-25 of spend a lot of time talking with them and working
 Transcript. with them on the schoolwork, trying to figure
 out if they're having problems and trying to
 remedy those problems, if they have it."
 Volume V. of Record, "I spend a lot of time with them. Virtually
 Page 47, Lines 10-25 and every vacation I take is with my children. I see
 Page 48, Lines 1-11 of them almost every morning. I mean, there are
 Transcript. some mornings when I'm out of town, but assuming
 I'm in town, I wake up. I get up with
 them. I wake them up. I give them breakfast.
 I usually drive them to school unless I have to
 be somewhere too early for that.
 I see them as soon as I get home in the
 evenings and spend all of my time with them
 until they go to bed. I read with them; do
 homework, with them. And virtually every
 weekend, I spend almost the entire weekend
 with them. Maybe once a month, I do some
 adult activity where the children don't go, or
 sometimes they go and do things with Bob
 where they go someplace separate, but at least
 every weekend I spend the entire weekend, and
 usually if I go someplace to see friends or go any
 place, it's usually in the company of my children."
 Q: "In what way have you contributed, and
 when I say that, I don't mean that in solely on
 economic terms, obviously, to meeting the medical
 needs of your children?"
 A: "Well, I think that I'm the one who watches
 out for those things. I mean, if one of my
 children wakes up in the middle of the night and
 gets sick to their stomach, they wake me up and
 I take care of them."
 Volume V. of Record, Q: "What role have you taken regarding the
 Page 50, Lines 7-25 and children's food throughout their lives?"
 Page 52, Lines 2-7 of A: "Well, throughout much of their life they
 Transcript. have had a person who would make their dinners.
 I make their breakfast most of the time
 and help them make their lunches most of the
 time ... I would say that the vast majority of
 cooking that's done when you don't have live-in
 help is done by me."
 Q: "What role, if any, have you played in regard
 to their shelter since they were born?"
 A: "Since we moved to Miami (from New Mexico)
 I've been virtually the sole person who has
 contributed to providing the house and paying
 for the house ... I know we talk a lot [referring
 to former husband and herself] about what goes
 on in school, who their friends are, what boys
 they like, what things they want to do, what
 presents they want to have, where they want to
 go and who they want to be with, and I'm very
 actively involved in what they do and very interested."
*1167
 Volume V. of Record, Referring to parental responsibilities of the parties
 Page 170, Lines 7-20 of regarding when a child is ill, and other
 Transcript parental obligations.
 A: "Frequently I'm up all night. If they're
 sick overnight, I'm up with them most of the
 night or whatever time they're up."
 Q: "You testified that during at least the last
 two years, you purchased the children's clothing,
 you take them for their haircuts and other items
 such as that.
 Is the reason that you do that because you have
 the money and Mr. Young doesn't?"
 A: "I think that I have always done that. I
 have always taken them shopping for their clothing.
 I can't remember an instance when Mr.
 Young did that, other than when he was traveling.
 When he travels with the children, they
 may go shopping someplace."
 Volume V. of Record, A: "I leave the house generally at about 8:10,
 Page 173, Lines 6-11 of 8:15 with the girls, drop them off at school, and
 Transcript. get downtown sometime between 9:00 and 9:15,
 depending on the traffic. I usually leave the
 office some time between 5:30 and 7:00, depending
 upon the day and what I'm doing."
Isabel Singletary (parties' Volume V. of Record Q: "What have you commented or observed
former neighbor; called Page 228, Lines 5-13 of regarding Alice's style of parenting."
by Alice). Transcript. A: "Alice is very good at instilling in the kids
 sort of their own self-expression and she participates
 a lot.
 In other words, if they are doing puzzles, if
 they are doing crafts, she draws a lot of the kids
 out, whether it is to take them to the zoo or
 whatever. She gets into the kids and draws out
 what's in them. So there's, I guess, more involvement
 from that aspect; less task-oriented."
 Volume V. of Record, Q: "Have you observed any difference in the
 Page 230, Lines 1-25 and amount of time either parent spends with the
 Page 231, Lines 3-7 of children since the announcement of the divorce?"
 Transcript A: "In the case of Alice, I don't see any difference.
 I mean, she has always been heavily
 involved with the kids on the weekends.
 The only time she's not involved with the kids
 is when she is on business."
 Q: "What are the circumstances where you
 would normally see Alice when she's away from
 the home?"
 A: "She might come to my house or we might
 go to the movies or grab a bite to eat. Very
 informal." Q: "Do you normally have your children
 with your, hers and yours when you are all
 together?"
 A: "Yes. Most of the times, yes."
 Q: "Would you say that it was more usual to
 see Alice with her children than not?"
 A: "Definitely, because when she's not working,
 she's with her kids. When she's working, I
 don't see her unless I come down to her office.
 So basically when I see her, the kids are
 around."
 Q: "What activities have you done with Alice
 and her girls?"
*1168
 A: "The zoo, the beach, the movies, endless
 crafts, endless puzzles. I can't even begin to tell
 you, but just plays, skits."
Laura A. Mirabito (parties' Volume VI. of Record, Referring to her daughter, Regina, and the Hectors'
neighbor, called by Page 265, Lines 4-10 of daughter, Avery.
Robert). Transcript. Q: "Laura, on the weekends when Regina
 comes over to play with Avery, is Alice normally
 at home and with them?"
 A: "Yes."
 Q: "On the evenings, when Regina has spent
 the night, is Alice always in the home with
 them?"
 A: "Yes."
Robert Young (father). Volume VI. of Record "... [P]art of why I married Alice is she's an
 Page 360, Lines 14-16 of absolutely wonderful mother, and I could see in
 Transcript. her being the mother of my children. That's
 never been an issue."
 Volume VI. of Record, Q. "During the last few years what has been
 Page 449, Lines 1-11 of your normal day with the children?"
 Transcript. A. "Well, the mornings vary. When Alice is
 there she's a morning person. She always
 has risen before me. I'm a night person and I
 typically always have gone to bed after her.
 And so if she's there, she will awaken the
 children and that's like some of her quality time
 with the kids in the morning and they'll have
 breakfast together. She'll drop them off at
 school on her way to work."
 Volume VI. of Record, "Her [referring to the mother, Alice Hector]
 Page 460, Lines 19-25 parenting is engaging. She loves to play games
 and Page 461 Lines 1-5 with the kids. Alice loves jigsaw puzzles and
 of Transcript. loves to bring the kids into that and do stuff
 together and do activities together and play
 games with the kids. And Alice is a reader.
 She loves to read, which is why a lot of instances
 maybe she's distant, but the wonderful thing
 about that is reading is wonderful and she has
 instilled and I say "she" read to the kids, too,
 but Alice is more focused on the reading with
 them than I have been because she loves to read
 so much that she loves reading with the kids."
 Volume VI. of Record "Maybe the children should stay with Alice until
 Page 471, Lines 19-21 of I get it done [referring to finding employment]
 Transcript. and the day I have the job they [referring to the
 children] can come live with me."
Carol Lumpkin (parties' Volume VI. of Record, Q. "Have you had an opportunity to observe Ms.
neighbor; called by Page 380, Lines 11-20 Hector with her children?"
Robert). Transcript. A. "Yes, I have."
 Q. "Could you tell me what you've observed?"
 A. "She's a very good mother. She spends as
 much time with her children as she can and I
 think that she's very loving and caring with
 them, also.
 I think both parents in this case have very
 different things to offer these children but they
 both have a lot to offer these children."
*1169 As I indicated above, I believe the record would also have supported the trial court if the father had been named as the primary residential parent. Notwithstanding that belief, I note that the record contains negative testimony about the father's qualifications to be the primary residential parent. While I do not believe that these negative factors should, standing alone, prevent the father from being named the primary residential parent, when viewed in the context of the entire trial, as the trial judge would have viewed them, these negative factors, when considered in connection with all of the preceding testimony about the mother, clearly can be viewed as part of the basis for the trial judge's conclusion that it would be in the best interests of the children for the mother to be named as the primary residential parent.
Solely for demonstrating what I believe to be the correctness of the comments that I have expressed in the preceding paragraph, the following is a brief summary of portions of the record that reflect negatively on the father's ability to be named the primary residential parent:
Ira Dubitsky (Guardian Volume V. of Record, Answer of "GAL":
Ad Litem)("GAL") Page 26, Lines 15-25,
 Page 27, Lines 1-22, and "... each of the parties harbors a good deal of
 Page 28, Lines 1-3. anger towards the other and what is apparent to
 me objectively is that they handle anger differently.
 Alice controls it better around the kids ...
 [her anger] did not carry over to her conversations
 with the children or the way it affected the
 children.
 Bob, on the other hand, also is very angry.
 He feels economically dependent. He feels that
 he is a victim and that he has not been treated
 right economically by Alice and has a tendency,
 although he tries to control it, to verbalize it
 more and both of the children mentioned to me
 ... he would do this and I experienced it myself
 where he would say things in the presence of the
 children that indicated to me his anger and his
 displeasure at what he perceives to be the financial
 inequities of the situation ... was concerned
 about this underlying anger to the point where I
 recommended to him that he get some counseling."
 Volume V. of Record, Q: "Did you discuss with him [Robert Hector]
 Page 34, Lines 18-25 and his plans as far as finding a career that would
 Page 35, Lines 1-3. accommodate the children?"
 A: "Extensively."
 Q: "Did he indicate to you that he was willing
 to do that?"
 A: "He did, but he was kind of vague about it.
 What he said was he wanted to get into some
 sort of contracting thing where he could like
 build a house in the neighborhood of his own
 house; then leave the job site, come home, and
 stuff like this and I don't know how realistically
 a plan that is, quite frankly."
Alice Hector (mother). Volume V. of Record, "When I have come home after dinner most of
 Page 57, Lines 5-9. the time, most of evenings after I come home, I
 have spent with them and he [the father] has
 done other activities, you know, done business
 on the phone or gone out or things like that ..."
*1170
 Volume V. of Record, Q: "You testified that you take care of the
 Page 168, Lines 23-25 medical needs for the children.
 and Page 169, Lines 6-17 Does that mean that Mr. Young does not pay
 of Transcript. attention to their medical needs?"
 A: "I would say that he doesn't recognize their
 medical needs as readily as I do. I would say
 that he doesn'tit's just not something that he
 pays attention to as much as I do."
 Q: "Do you know of one instance where he [the
 father] neglected the medical needs for the children?"
 A: "I know that on many instances I've said,
 `They really have to go to the doctor today.' I
 will have mentioned it a couple of times. She's
 [referring to their children] sick for over a couple
 of days, and then I might get insistent, and
 that's happened a number of times.
 I know I'm usually the person who indicates
 that they are at a level that they need to go to
 the doctor and I think virtually every time they
 have gone, they need antibiotics. I mean, it was
 something that they needed to be at the doctor
 for soon. It was something that could not be
 cured without going to the doctor."
 Volume V. of Record, "... I wouldn't necessarily call them fights, but
 Page 182, Lines 15-24; during the period of time, the 13 months between
 Page 183, Lines 8-11 of '92 and '93, we had a number of discussions
 Transcript. in that period of time, which I would insist
 he needed to see the children, that the children
 hadn't seen him for four weeks or six weeks and
 he really needed to make time for them.
 He would say he was really busy, that things
 were really difficult out there, and he had to
 wait on some particular thing ... I tried to
 make sure that he saw them about once a
 month, at least every five weeks. I think there
 may have been once or twice when it was actually
 longer than that."
For all of the foregoing reasons, as well as the very cogent discussion of the facts and law contained in the majority opinion, I strongly agree that the original panel opinion rendered by this Court on this case must be reversed and the decision of the trial court, to name the mother as the primary residential parent, must be affirmed.
SORONDO, J. (concurring).
I agree with the majority and write separately only to address those portions of the dissents which rely on the original panel's opinion.
The original panel opinion states that "a trial court's decision as to which parent should be awarded primary residential custody of the children should attempt to preserve and continue the care taking roles that the parties had established. Such a continuation would clearly be in the best interest of the children." On rehearing, Mr. Young has embraced this reasoning, but the record reflects that this was not his position below. During trial, Mr. Young testified that he wanted to be the primary residential parent for the children. He also recognized that he was confronted with the considerable task of re-integrating himself into the labor force. As concerned future employment, he testified that he had three possible choices: 1) architecture, 2) construction, or 3) working in an entrepreneurial manner for himself. He observed that the first two options would require post-graduate education directed towards achieving a master's degree. He estimated the cost of this additional education at approximately $30,000. *1171 Later in his testimony, during a lengthy narrative, he said:
Judge, you have a difficult assignment of figuring out, you know, how to haveso everybody wins when the best situation is sort of basically everybody loses in the sense that nobody gets what they want. Not "loses" and everybody is unhappy and that's a winning situation. [Another father] has been able to arrange his schedule around his children and I just hope I can. I need help to do it and I want help to do it and I want to get it done. Maybe the children should stay with Alice until I get it done and the day I have the job they can come live with me. I want to get a job that allows me to be with them. I want to be with them at three o'clock when they get out until they go to bed.
(Emphasis added). During closing argument, Mr. Young's lawyer followed up on the same theme:

[Robert] suggested an alternative. I would adopt that suggestion. I don't think that it's an unreasonable suggestion. He does need to get a job.
* * *
Financially, right now, I'm not certain I can come up with a plan but I am certain that there is a way to accommodate it. I'm not a fan of temporary orders but certainly in this case it might be one that begs out for a temporary order to allow him an opportunity, without the children, without the responsibility for the children, to get on his feet.

He needs to do that and I'll be the first to admit it and he's not going to do it while the divorce is pending and he's certainly not going to do it with two little children that he has to care for starting at three o'clock every day but, if he's willing and motivated, I think he can find a position that would allow him to have more time with the children at least than a 9:00 to 5:00 position and maybe even more than that. He might get lucky. He might find someone who is willing to accommodate him.
(Emphasis added). Mr. Young's testimony, and his lawyer's summation, categorically establish that the "continuity" argument adopted by the dissent was not raised in the trial court. It is clear that neither Mr. Young nor his lawyer were overly concerned with the "continuity" problem, as they were both willing to surrender primary custody during the proposed two year educational rehabilitation period. Moreover, in such a close case, this willingness to give Ms. Hector primary custody may well have tipped the scales in her favor. Indeed, the quoted portion of counsel's summation above is found on page 531 of the trial transcript, and on page 532 the trial judge designates Ms. Hector as the primary residential parent. A party cannot invite error at the trial level then be heard to complain about it on appeal. See Gupton v. Village Key & Saw Shop, Inc., 656 So.2d 475, 478 (Fla.1995)(defining the invited error rule as follows: "a party cannot successfully complain about an error for which he or she is responsible or of rulings that he or she has invited the trial court to make."); Held v. Held, 617 So.2d 358 (Fla. 4th DCA 1993); Poller v. First Virginia Mortg. and Real Estate Inv. Trust, 471 So.2d 104 (Fla. 3d DCA 1985).
Even if the "continuity" argument had been made and properly preserved, a close analysis of the evidence establishes that the trial judge's decision does not frustrate that goal. Mr. Young testified that Ms. Hector was the parent who awakened the children, dressed them and gave them breakfast. He and Ms. Hector would share the responsibility of taking the children to school. Under the final judgment, this process would remain unchanged. He testified that while the children were in school he would return home and either work on his upcoming divorce, manage his stock market accounts or perform household errands. Nothing in the final judgment would change his "during-school" activities. He indicated that either he or the *1172 housekeeper would pick up the children at school and he would then share a variety of "after-school" activities with them. Under the final judgment he would still be able to do that. He further testified that he would have dinner with the children on an almost daily basis. Nothing in the final judgment will change this. When Ms. Hector came home in the evening he would either retire to his room or leave the house, and the children would spend time with their mother, who would talk with and read to them. This also will remain the same. In short, as far as the children are concerned, under Option 1 of the final judgment, nothing in their lives will change unless Mr. Young becomes unavailable due to his educational, or, ultimately, career objectives. If these objectives interfere with what the children have come to know, they will be equally obstructive if Mr. Young were designated the primary residential parent. It is therefore clear that the final judgment does not impede the "continuity" of the children's lives, nor does it significantly alter the care taking roles of their parents.
SCHWARTZ, Chief Judge (dissenting).
I remain convinced by the panel decision and by the dissents of Judge Nesbitt and Judge Goderich that the trial court's "award" of the children's primary physical residence to the mother is unsupported by any cognizable, equitable consideration presented by the record. As the panel opinion, which has not in my view been successfully challenged by any of the contrary briefs or opinions,[1] demonstrates, the children's parents, who know and care most about their welfare, had themselves established an arrangement prior to the dissolution as a part of which, upon any fair assessment, the father was the primary caretaker. See Principles of the Law of Family Dissolution: Analysis and Recommendations (Am. Law Inst.1998)(Tentative Draft No. 3, Part I) § 2.03(6).[2] As everyone agrees, under that regime, if not because of it, their girls have turned out to be well-behaved, welladjusted, and accomplished young women who love both their parents: just what we all devoutly wish for and from our children. There is simply no reason for a court to tamper with what has worked so well. See Principles of the Law of Family Dissolution: Analysis and Recommendations (Am. Law Inst.1998)(Tentative Draft No. 3, Part I) § 2.09(1).[3] This is not only because it is almost always better to preserve *1173 a known good rather than to risk what the unknown future may bring, see Rumph v. V.D., 667 So.2d 998, 998 (Fla. 3d DCA 1996)(Schwartz, C.J., specially concurring), but, much more important, because the children are themselves entitled to stability in their lives and routine which would be compromised by any purposeless change in their caregiver. In many areas, the law properly recognizes the undesirability of disrupting the children's circumstances any more than is already necessarily required by their parents' separation and divorce. § 61.13(3)(d), Fla. Stat. (1995).[4] See Mize v. Mize, 621 So.2d 417 (Fla.1993)[5] (relocation of custodial parent); Pino v. Pino, 418 So.2d 311 (Fla. 3d DCA 1982)(importance of children's remaining in home). This principle finds special application in the rule that modifications of the custody provisions of a final judgment may be made only when there has been a change of circumstances adversely affecting the welfare of the children. Belford v. Belford, 159 Fla. 547, 32 So.2d 312 (1947); Ritsi v. Ritsi, 160 So.2d 159 (Fla. 3d DCA), cert. denied, 166 So.2d 591 (Fla. 1964). When, as here, the children have manifestly benefitted from an arrangement established before the judgment, the same rule should apply.
What happens when that rule is not applied is illustrated by the result in this very case, in which it was necessary below and has been found necessary on appeal to resort to other, inadmissible, factors to justify the so-called exercise of discretion by the trial court and the affirmance of that result by this one.[6]

A.
In my opinion, there is no question whatever that the result below was dictated by the gender of the competing parties. It is usually extremely difficult to gauge the underlying motivations of any human being and one resists even more the assignment of an unworthy or impermissible reason to any judge's exercise of her judicial functions. This case, however, permits no other conclusion. I believe that this is shown by contemplating a situation in which the genders of the hard working and high earning lawyer and the stay at home architect were reversed, but everything else remained the same. The male attorney's claim for custody would have been virtually laughed out of court, and there is no realistic possibility that the mother architect would have actually "lost her children."[7] *1174 (The fact, so heavily emphasized by members of the majority, that the hypothetical mother architect might have sought employment after the dissolution, as usually occurs, and that her time with the children would have therefore diminished, would have made no difference either.)[8] It is, at best, naive in the extreme to suggest, let alone find, that the result below was not dictated by the evil of gender bias.

B.
By rejecting the obvious but unacceptable in its search for a basis for the result below, the majority has, in my opinion, relied upon something even worse. In the end, after a meticulous inquiry into the father's long past and non-parental conduct which few mortals could withstand, it bases its determination that the discretion of the trial court was properly exercised upon the belief that the record shows (or that the trial court might have properly believed) that Mr. Young is less sincere, less well motivated, less admirable and generally a worse person and a worse parent than Ms. Hector. As I might do myself, one may agree with this assessment of the parties while profoundly disagreeing, as I certainly do, with the idea that any such consideration is a proper basis for decision-making in this field. See Rumph, 667 So.2d at 998.
It is of course true, as the majority repeatedly emphasizes, that a "custody" decision is one within the discretion of the trial court. But judicial discretion may properly be exercised only on the basis of factors which are legally pertinent to the issue involved. Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980)[9]; see Farrior v. Farrior, 736 So.2d 1177 (Fla.1999)[24 FLW S297]. In this area, that issue is the children's best interests. Its resolution, in turn, cannot be based on a subjective assessment of the worth of the contending parties so long as, as was conclusively demonstrated in this case, the conduct and character traits referred to have not impacted upon the children. We had, I thought, come a long way from the time when a parent could be denied her parental rightsor, more properly stated, when the children could be deprived of their *1175 rights to having only their interests considered merely because a judge may disapprove of her standards of conduct, much less of her character. Dinkel v. Dinkel, 322 So.2d 22 (Fla.1975).[10] Apparently, I was mistaken.[11] See Anderson v. Anderson, 736 So.2d 49, 53 n. 1 (Fla. 5th DCA 1999)[24 FLW D1273, D1275 n. 1](challenging Dinkel). Although only with the best of intentions, and fortunately in a case in which children will thrive in the care of either parent (or both of them), the majority has perhaps unwittingly provided that custody decisions are subject to the personal views of a particular judge, who sits as a Dostoevskian Grand Inquisitor, the effectuation of whose own notions of right and wrong are subject to objective review by no one on this earth. In a society of law and not persons, unknowable and unjudgable questions of character, personal worth, and even actual "misconduct," if irrelevant to the issue under consideration,[12] should not govern decision making in this area or any other. See S.B. v. D.H., 736 So.2d 766, 767 (Fla. 2d DCA 1999)[24 FLW D1563, 1564]("There is no Solomon within our judiciary who can accurately predict who would be the `better' father for this child."). Results on indistinguishable operative facts should not vary from courtroom to courtroom according to the moral preferences of the trial judge (or appellate panel) assigned by the *1176 luck of the draw to hear the case.[13]Farrior v. Farrior, 736 So.2d at 1179 [24 FLW at S298](Pariente, J., concurring).[14] Because the majority's decision is to the contrary of these propositions, I believe that it is very wrong.
NESBITT, J. (dissenting):
I respectfully dissent.
I entirely agree with the original decision and opinion of this court, filed June 24, 1998 at 23 Fla. L. Weekly D1529, 740 So.2d 1154. The heightened interest in the case prompts me to discuss the determinative factors which originally caused me to vote for reversal and against rehearing en banc.
The record demonstrates that both the mother and the father of the children are completely and entirely fit and worthy (as the trial court found) to serve as primary residential parent. As the wife's law practice grew and prospered (she was working 11 and 12 hour days and was frequently gone overnight), she relied more and more upon the husband, who accepted the responsibility for the care and needs of the girls. The arrangement began in the fall of 1993 and continued until the 1996 dissolution proceeding which led to the husband's summary eviction from the marital home. Acquiescence to the child custody arrangement can and has been found to be an important factor of various aspects of child custody problems. See Farrell v. Farrell, 555 So.2d 1260, 1261 (Fla. 3d DCA 1989); Berhow v. Crow, 423 So.2d 371, 373 (Fla. 1st DCA 1982); In re Marriage of Feig, 296 Ill.App.3d 405, 230 Ill.Dec. 685, 694 N.E.2d 654, 657 (1998); In re Marriage of Jackson, 682. N.E.2d 549 (Ind.Ct. App.1997); Wright v. Stovall, No. 01A01-9701-CV-00040, 1997 WL 607508, at *5 (Tenn.Ct.App. Oct.3, 1997). This salient factor was wholly ignored by the trial court. Section 61.13(2)(b)1, Florida Statutes (1995), in part provides "the father of the child shall be given the same consideration as the mother in determining the primary residence of a child irrespective of the age or sex of the child."
In Cherradi v. Lavoie, 662 So.2d 751 (Fla. 4th DCA 1995), the Fourth District observed that the tender years doctrine was impermissible as it used gender as a basis for awarding custody. Id. at 753. The Fifth District has noted that "[e]ven though [the tender years] doctrine was overturned by the legislature's gender neutral policy, there remains a temptation for many judges to consider the right to custody as the mother's to lose and unless her fitness is legitimately challenged, the father's right of equal consideration is often ignored." Ayyash v. Ayyash, 700 So.2d 752, 754 n. 3 (Fla. 5th DCA 1997).
In this proceeding the trial judge totally ignored the gender neutral policy. For example, at one point in the proceeding he asked the husband, "Maybe there's something I don't understandwhy don't you get a job?" It is extremely unlikely that any circuit judge in Florida would have asked the same question of the mother of *1177 young children whose husband was then earning a substantial annual income.
Sub silentio, this court like the trial court continues to pillory the father because he is not the substantial bread winner in the family. But there is little or no correlation between being the money maker or between being wealthy or not; in order to make one an effective parent.
By today's decision, the court remains aligned with the traditional view that a mother will not lose her entitlement to become the primary residential parent unless her unfitness is demonstrated; no matter how actively she is engaged outside of and away from the home, even though the other parent is fit and willing to serve in that capacity. Such holding necessarily implies that children therefore will be substantially or in part reared by a surrogate parent. It occurs to me that both the children and the societal interest are better served by placement with a natural parent who is available.
Given the parties' own conduct toward the care and rearing of these children it leaves no doubt that their best interests would be that they remain with their primary care giver; here their natural father. Where parents themselves have established an arrangement (which they do not either dispute, contradict or refute) which supports the children's best interests there is no reason for the courts to interfere.
I therefore dissent with the child custody dispute but agree with reversal of the financial issues, because that portion of the judgment is skewed as the rest.
GODERICH, J. (dissenting):
I respectfully dissent for the reasons expressed in the panel opinion. Young v. Hector, 23 Fla. L. Weekly D1529, 740 So.2d 1158 (Fla. 3d DCA 1998). It is incomprehensible how the majority of the en banc panel can agree that the trial court abused its discretion in virtually every final ruling it made, except as to its ruling on the award of primary residential custody. It is apparent that the trial court also abused its discretion by awarding primary residential custody of the minor children to the parent who has been working long hours as a senior litigation partner in one of Miami's top law firms as opposed to the parent who has not worked outside of the home for the three years preceding the filing of the dissolution action.
The majority opinion focuses on the fact that the parties did not mutually agree that the father would stay at home to care for the children. Although it may be true that the mother did not expressly agree, the record demonstrates that the mother nonetheless acquiesced to this arrangement by allowing it to continue for three years. For example, although the parties had "separated," the mother permitted the husband to live in the marital home and to continue his role as a stay-at-home parent. Moreover, there is no doubt that the mother benefited from this arrangement (and possibly that is why she allowed it to continue). As a result of this caretaking arrangement, the mother was free to dedicate herself to her legal career by working extremely long hours[1] without having to worry about whether the minor children's emotional needs were being met. Also, the record indicates that the children also benefited from their father's role as the primary caretaker since he was actively involved in their school and after-school activities.
Further, I believe that gender played a role in the trial court's decision, and continues to play a role in this Court's decision. At one point, the trial court, while questioning the father as to the nanny's role, stated to the father: "Maybe I'm missing something. Why don't you get a job." Shortly thereafter, the trial court also stated: "Why [sic] do you need the *1178 nanny for, if you're there doing it?" The majority opinion claims that
this inquiry by the court is not evidence of gender bias. Given the undisputed large financial indebtedness of this couple, the trial court's inquiry about the need to employ a full-time nanny was both logical and practical under these circumstances and certainly could have also been appropriately posed to the mother if she had been recalcitrant about seeking gainful employment to assist the family's financial situation.
(Maj. op. at 1162). I do not agree with the majority's observation that these statements had nothing to do with gender bias, but rather was a result of the parties' financial condition. During the trial court's exchange with the husband, there is nothing that would indicate that the trial court was concerned with the parties' financial condition. (Maj. op. at 1162). Further, I find it extremely hard to believe that if the roles were reversed any trial judge would question a mother's lack of employment or the employment of a nanny when the father earns over $300,000 per year. Moreover, the record indicates that it was the mother, not the father, who employed the nanny. (Maj. op. at 1159).
The majority opinion also suggests that the father should have obtained gainful employment in order to financially assist the household and minor children in light of the parties' financial condition. The record clearly demonstrates that with the husband's present skills, he did not have the ability to earn a substantial amount of money. Further, this was not a family in which the working parent was earning $30,000 and any additional sums earned by the other parent would have been helpful to provide the children with basic necessities such as food, clothing, and shelter. The record clearly establishes that the minor children's basic necessities were more than taken care of. There are certain things that money cannot buy and that a nanny cannot provide, such as the attention of caring parents.
Once again, I do not believe that if the roles were reversed (a father who earns over $300,000 per year and a non-working mother), the majority would have suggested that the children would have been better off if the mother would have attained employment when her earning potential is limited and the father already makes over $300,000 per year. Instead, the majority would have probably suggested that the father restructure his debt, sell assets, and/or cut down on expenses so that the mother could continue the caretaking role that was established during the marriage.
The majority opinion also addresses the three "determinative factors" that the guardian ad litem looked at in recommending that the mother be named the primary residential parent. First, the guardian focused on the fact that the mother has been more economically stable throughout the marriage. Once again, if the roles were reversed, I believe that the guardian ad litem would not have considered economical stability as a "determinative factor." Further, in light of the child support guidelines, a parent's financial resources should never be considered as a "determinative factor" in deciding which parent should be awarded primary residential custody of the minor children.
The second "determinative factor" was that the mother has been "the more constant factor throughout the entire relationship." The guardian ad litem focused on the fact that the father had been "away from the home for substantial periods of time...." I feel that it is important to explain why the father had been away from the home. First, when the parties decided to move to Miami, the father stayed in New Mexico for approximately three months in order to move the family's possessions to Miami and to make improvements to the marital home so that the parties could sell the home at its highest possible price. Second, the husband, was away for three to four weeks to be *1179 with his ill brother, who died shortly after he arrived, and to help settle his brother's estate. Finally, the father was in New Mexico from June 1992 to September 1993 in order to direct a treasure hunt project. The majority relies on the "treasure hunt" to make it appear as if the treasure hunt was a crazy or weird notion. However, what the majority has failed to state is that it may not have been so strange since the mother's parents and trial counsel also invested in this project. Therefore, the reasons for the father's absence from the home were valid. Further, the fact that the father had been away from the family should not be a "determinative factor" when taking into consideration that the father has been the primary caretaker since the fall of 1993.
Finally, the third determinative factor was that the mother "controls her anger better around the kids." The guardian ad litem testified that the father "would say things in the presence of the children that indicated to me his anger and his displeasure at what he perceives to be the financial inequities of the situation...." I agree with the guardian ad litem that being able to control anger is an important factor in deciding child custody issues. However, the father's anger was based on the "financial inequities of the situation," a problem that should be completely resolved based on the majority's decision to reverse and remand all financial determinations made by the trial court, including the insufficient award of alimony to the father and the inequitable distribution of the marital assets and liabilities.
Finally, I would like to note that the scenario contained in the present case is unique. In situations where families are fortunate enough to have one parent stay at home to care for the children, it is usually the mother. Because the present situation is not the norm, this may be why it is difficult to see that the trial court abused its discretion by not awarding primary residential custody of the minor children to the father, the parent who has not worked outside of the home for the past three years in order to care for the minor children.
For all these reasons, I dissent as to the majority's decision as to the child custody issue, but agree with the majority, as I originally did in the panel opinion, that the financial issues must be reversed and remanded for further proceedings.
NOTES
[*] Judge Shevin is recused.
[1] This certainly was a valid consideration which could have factored into the lower court's determination as to the custody of the minor children in this case.
[2] The fact that the children deemed their mother to be the "go to" parent when they were ill or distressed during the night speaks volumes about which parent they deemed to have been their constant caregiver. Moreover, it supports the guardian ad litem's observation that the mother had been "the more constant factor throughout the entire relationship."
[3] [Q] You testified that you had tried to get Alice to put together a budget and typically she would say to you, "We don't have that much money."

Did she not every time follow it up with a comment, "And you need to go to work?"
[Father] No.
[Q] Did she ever suggest to you you needed to go to work?
[Father] Yes.
[Q] On more than five (objections/occasions) [sic]?
[Father] Oh, yes, when she filed for divorce, it was a lot more than five occasions.
[4] As the father testified:

[Q] In the evenings, when Alice comes home, do you pretty much absent yourself since the time that she's indicated that she wants this divorce?
[A] Yes and no. She, a lot of times, likes to sit down have a little time to herself and eat dinner and not be bothered. Then after that she will engage the kids. And I will either leave the house and leave her with the kids or I may go to my room or I may go to the study and close the door. I don't generally sit down next to her and say, "Let's all play this game together." Yes, I try to give her space with the kids, as I mentioned earlier. I don't compete with her, either.
[Q] Do you spend most evenings and some nights away from the home?
[A] Most evenings, I don't know. I spend, because of the situation, a good deal of time away after she comes home.
[5] The trial court's skepticism about the father's "actual" availability for the children during the day was also borne out by an observation made by the guardian ad litem in his report. The report indicated that the mother was late for her scheduled appointment with the guardian because upon learning that the youngest child had become ill during school, the mother had to arrange for her brother to pick up and care for the child until back up help became available, due to the unavailability of the father.
[6] Interestingly, the father's own attorney conceded in closing argument that the father needed to be gainfully employed.

He needs to do that [find employment] and I'll be the first to admit it and he's not going to do it while the divorce is pending and he's certainly not going to do it with two little children that he has to care for starting at three o'clock every day but, if he's willing and motivated, I think he could find a position that would allow him to have more time with the children at least than a 9:00 to 5:00 position and maybe even more than that. He might get lucky. He might find someone that's willing to accommodate him.
[7] It is interesting that both, the guardian ad litem and the father's own attorney recognized the unreasonableness of the father's proposed plan to remain at home full-time with the children as their custodial parent without gainful employment. The guardian ad litem observed in his report the following:

Finally, it is my belief that the Husband's plan to remain a full time parent is unrealistic; and although he rationalizes that things would be different if he were a woman, I don't believe that the Court would treat a woman with the same background and qualifications any differently from a man, in the absence of an agreement between the parties, which both sides agree does not exist; ...
Similarly, during closing arguments, the father's counsel observed:
Essentially it's an economic issue versus a time issue. Mr. Young's position right now, which we all agree is unreasonable, is the best for the children.
If you were to stay home and be supported and be with the children and get rid of the housekeeper that would be the best scenario. I don't think that's a fair scenario. I don't think anyone is suggesting it.
[1] Much of the picking at the panel fallaciously assigns the "caretaking functions" of the housekeeper to the mother and relies upon a possible change in the circumstances of the parents which might follow the dissolution.
[2] § 2.03 Definitions

(6) Caretaking functions are tasks that involve interaction with the child or direct the interaction and care provided by others. Caretaking functions include
(a) feeding, bedtime and wake-up routines, care of the child when sick or hurt, bathing, grooming, personal hygiene, dressing, recreation and play, physical safety, transportation, and other functions that meet the daily physical needs of the child;
(b) direction of the child's various developmental needs, including the acquisition of motor and language skills, toilet training, self-confidence, and maturation;
(c) discipline, instruction in manners, assignment and supervision of chores, and other tasks that attend to the child's needs for behavioral control and self-restraint;
(d) arrangements for the child's education, including remedial or special services appropriate to the child's needs and interests, communication with teachers and counselors, and supervision of homework;
(e) the development and maintenance of appropriate interpersonal relationships with peers, siblings, and adults;
(f) arrangements for health care, including making appointments, communication with health-care providers, medical follow-up, and home health care;
(g) moral guidance; and
(h) arrangement of alternative care by a family member, baby-sitter, or other child-care provider or facility, including investigation of alternatives, communication with providers, and supervision.
[3] § 2.09 Allocation of Custodial Responsibility

(1) Unless otherwise resolved by agreement of the parents ... or unless manifestly harmful to the child, the court should allocate custodial responsibility so that the proportion of custodial time the child spends with each parent approximates the proportion of time each parent spent performing caretaking functions for the child prior to the parents' separation....
[4] (3) For purposes of shared parental responsibility and primary residence, the best interests of the child shall include an evaluation of all factors affecting the welfare and interests of the child, including, but not limited to:

* * *
(d) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.
[5] Adopting opinions in Hill v. Hill, 548 So.2d 705 (Fla. 3d DCA 1989)(per Nesbitt, J.; Schwartz, C.J., specially concurring), review denied, 560 So.2d 233 (Fla.1990).
[6] Crediting the past record of the division of caretaking functions between the parents also has the very salutary consequence of avoiding reliance on such factors as the expressed preferences of the children, see Fla.R.Fam.Law P. 12.407, and, even more, the misnamed "expert" opinions of participants in the thriving cottage industry of forensic child psychology. See Principles of the Law of Family Dissolution: Analysis and Recommendations (Am. Law Inst.1998)(Tentative Draft No. 3, Part I); Regan v. Regan, 660 So.2d 1166, 1168 (Fla. 3d DCA 1995)(Schwartz, C.J., dissenting in part); Keesee v. Keesee, 675 So.2d 655 (Fla. 5th DCA 1996)(Griffin, J., concurring specially). The majority's refusal to follow the prior caretaking arrangement rule in this case may well result in emphasis upon these factors in the future. (Commendably, however, despite the depth of their own dispute, the parties here at least did not require their girls to choose up sides in the litigation nor involve them in an unnecessary and damaging process of psychological testing, treatment, and disclosure.)
[7] That the issues have so often been put in these terms, which better describe a sports event than a dispassionate search for a result which most benefits the children is one of the most unfortunate aspects of this case. See Mize v. Mize, 621 So.2d 417, 420 (Fla.1993)(Barkett, J., concurring)(expressing grave doubts as to wisdom of employing adversary process in resolving family issues). That it should be widely thought that a mother, and only a mother, is considered morally or maternally deficient if she is not granted custody, is a testament to the pervasiveness of sexual stereotyping in our supposedly genderblind society. That the majority decision will likely serve to perpetuate both of these fallacies is disheartening.
[8] That working fathers have almost never actually gained custody has not prevented the use of such claims or even the threat of bringing them as effective "bargaining chips" meaning instruments of extortionin settling the financial disputes which are usually the only real issues in these cases. Taking the majority at its word that the sex of the working parent makes no difference, the result in this case, which means that a non-caretaking father may actually succeed in "taking the children away" from the mother, will inevitably result in a great increase in the dollar value of this nefarious tactic, and in the involvement of the courts in the use of children as pawns in personal disputes between alienated spouses. Of all the many adverse consequences of today's decision, these may be the most serious.
[9] Quoting from B. Cardozo, The Nature of the Judicial Process 141 (1921):

The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to "the primordial necessity of order in the social life." Wide enough in all conscience is the field of discretion that remains.
Canakaris, 382 So.2d at 1203.
[10] Poor moral choices are insufficient grounds to modify custody, absent some impact on the child. Dinkel v. Dinkel, 322 So.2d 22 (Fla.1975); Jablon v. Jablon, 579 So.2d 902 (Fla. 2d DCA 1991). Frequent moves, a less stable lifestyle, even poor relationship choices standing alone may not support a custody modification where the residential parent has moved out of necessity, has subsequently established a stable home, and the child's needs have always been met. See Jablon v. Jablon, 579 So.2d 902 (Fla. 2d DCA 1991); Kelly v. Kelly, 642 So.2d 800 (Fla. 2d DCA 1994).

Sullivan v. Sullivan, 736 So.2d 103, 105 (Fla. 4th DCA 1999)[24 FLW D1473].
[11] Anderson v. Anderson, 736 So.2d 49 (Fla. 5th DCA 1999)[24 FLW D1273] shows the consequences of the majority holding in this case. There, a special master "took the children away" from their mother apparently because of her perceived misconduct which, as the dissent establishes, did not affect their well being. The reviewing circuit judge, like the panel here, reversed that decision but was in turn reversed by the Fifth District which, like our en banc court, found that the master's recommendation was not an abuse of discretion. Judge Thompson's dissenting opinion demonstrates the incorrectness of upholding a particular decision as an exercise of discretion in the absence of any legitimate basis upon which the decision could have been reached. It shows also, if we must put the issue in gender-based terms, that the decision may well backfire against many mothers, the vast majority of whom, because they so much more often have actually been the children's caretakers before the dissolution, have historically been granted custody.
[12] I have long held and often expressed the opinion that, in certain circumstances, a good case can be made for considering, dare I say it, "fault" in determining the financial consequences of a dissolution, on the grounds that it concerns only issues between husband and wife and that it may be

improper to permit an errant spouse to destroy a marriage and then to claim benefits equal to those which would have been provided had it remained intact.
Smith v. Smith, 378 So.2d 11, 15 (Fla. 3d DCA 1979), cert. denied, 388 So.2d 1118 (Fla. 1980); Pitts v. Pitts, 412 So.2d 404, 405 n. 1 (Fla. 3d DCA 1982); Martin v. Martin, 366 So.2d 475, 475 (Fla. 3d DCA 1979)(Schwartz, J., specially concurring); see also Baxter v. Baxter, 720 So.2d 624, 624 (Fla. 5th DCA 1998)(Harris, J., concurring and concurring specially). It seems, at least to me, ironic, and it is certainly personally upsetting, that the law is now completely to the reverse of what I think it should be. Such cases as Noah v. Noah, 491 So.2d 1124 (Fla.1986) and Heilman v. Heilman, 610 So.2d 60, 61 (Fla. 3d DCA 1992) establish that Florida will not permit misconduct to interfere with the right to recover money and property from one's exspouse. Anderson v. Anderson, 736 So.2d 49 (Fla. 5th DCA 1999)[24 FLW D1273] and the majority opinion here establish that the welfare of children can be compromised by a judge's adverse opinion of the character or lifestyle of one of their parents. For all the good it will do, I protest.
(I note that applying my views to this case might conceivably result in a reversal of the custody and child support rulings below but an affirmance of the alimony and equitable distribution provisionsjust the opposite of what the court has done.)
[13] McAllister v. McAllister, 345 So.2d 352 (Fla. 4th DCA 1977), cert. denied, 357 So.2d 186 (Fla.1978)(Letts, J.), cited in Smith v. Smith, 378 So.2d at 11.
[14] Quoting from Canakaris:

The discretionary power that is exercised by a trial judge is not, however, without limitation, and both appellate and trial judges should recognize the concern which arises from substantial disparities in domestic judgments resulting from basically similar factual circumstances. The appellate courts have not been helpful in this regard. Our decisions and those of the district courts are difficult, if not impossible, to reconcile. The trial court's discretionary power is subject only to the test of reasonableness, but that test requires a determination of whether there is logic and justification for the result. The trial courts' discretionary power was never intended to be exercised in accordance with whim or caprice of the judge nor in an inconsistent manner. Judges dealing with cases essentially alike should reach the same result. Different results reached from substantially the same facts comport the neither logic nor reasonableness.
382 So.2d at 1203.
[1] Even the majority agrees that the mother's working hours are not "typical." The majority is of the opinion that "typical working parents" arrive home between 5:30 and 6:00 each evening. (Maj. op. at 1159).