667 So.2d 998 (1996)
James RUMPH, Appellant,
v.
In the Interest of V.D., a child, etc., Appellee.
No. 94-1470.
District Court of Appeal of Florida, Third District.
February 14, 1996.
Gregory A. Samms and Samia P. Giddings, Certified Legal Intern, Miami, for appellant.
Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel and Charles M. Auslander; Robin H. Greene; Rosemarie S. Roth, Miami, for appellee.
Before SCHWARTZ, C.J., and BASKIN and GERSTEN, JJ.
BASKIN, Judge.
We affirm the order denying the maternal granduncle's motion for change in custody of the dependent child. The trial court based its ruling on competent substantial evidence, including the testimony of two experts who stated that a transfer would be harmful to the child. § 39.41(4)(b), Fla.Stat. (Supp. 1994). This is a temporary order, not a final disposition, and we hold that the court did not abuse its discretion.
Affirmed.
GERSTEN, J., concurs.
SCHWARTZ, Chief Judge (specially concurring).
The order under review[1] continued the "temporary" placement of a dependent three-year old, "mixed race," and thus, in practical effect, African-American girl,[2] with the Caucasian *999 foster mother with whom she had lived since she was three months old, and denied a transfer of custody to her completely qualified African-American maternal great-uncle and his family in South Carolina. The record and our social and legal consciousness overflow with factors which may influence the difficult determination of whether this decision should be affirmed as one which reflects the "child's best interest" under the controlling provisions of section 39.41(4)(b), Florida Statutes (Supp.1994).[3] I have surrendered to the conclusion, however, that most of those considerationsincluding the directly competing, almost equally unpersuasive views of the "expert" child psychologists[4]; the effect of the racial differences involved; the existence and significance of the so-called "bonding" phenomenon; the relative merits of a nonrelated parent figure and a blood relative who is a stranger to the child; and the extent, if any, that foster parents should be discouraged from attachments to their charges[5] are all either so speculative and amorphous or, as policy matters, so far beyond the proper role of the judiciary to resolve that they are not sound bases for decision. See Randy F. Kandel, Just Ask the Kid! Towards a Rule of Children's Choice in Custody Determinations, 49 U.Miami L.Rev. 299 (1994); Annot., Continuity of Residence as Factor in Contest Between Parent and Nonparent for Custody of Child Who Has Been Residing with Nonparent-Modern Status, 15 A.L.R.5th 692 (1993); Annots., Race as Factor in Adoption Proceedings, 34 A.L.R.4th 167 (1984); 54 A.L.R.2d 909 (1957); Annot., Validity and Enforcement of Agreement by Foster Parents That They Will Not Attempt to Adopt Foster Child, 78 A.L.R.3d 770 (1977); Annot., Award of Custody of Child Where Contest Is Between Child's Grandparent and One Other Than Child's Parent, 30 A.L.R.3d 290, at § 28 (1970).
In the absence also of a clear and binding statutory or common law basis for choiceas would be the case, for example, if one of the contestants were the child's natural parent, see Murphy v. Markham-Crawford, 665 So.2d 1093 (Fla. 1st DCA 1995), and cases citedone is left with a single unquestioned fact and the logical consequences which flow from it: the child is a well-adjusted, happy youngster living in the custody of a person who loves her and treats her well and is loved in return. Experience, common sense *1000 and therefore the law teachwithout the need for expert testimonyboth that stability is better than disruption for the psychic health of everyone, and particularly small children, § 61.13(3)(d), Fla.Stat. (1993), and that it is unwise to risk a known good in a certain present for the necessarily unknown possibilities of an uncertain future. Since the order below follows these principles, the only ones I deem reliable, I concur in its affirmance.
NOTES
[1] 1. The child, who is of mixed parentage, was born on June 11th, 1991, and was placed in the custody of a white foster mother from the time she was 11 weeks old to her present age of 3. The child's maternal great uncle, James Rumph, who is black, petitioned the Department of HRS in June of 1993 for custody of his niece immediately after he discovered she was in foster care.

2. Prior to the uncle's request for custody, the child had established a bond with the foster mother having lived with the foster mother from the age of 11 weeks to the present age of 3. HRS never initiated termination proceedings.
3. The Mother failed to appear at this hearing and her whereabouts are unknown to her counsel and the Department of HRS.
4. The greater weight of the expert opinion indicates that any change of the child's custody at this time will cause substantial emotional harm to the child. Particularly because of the child's toddler age, there will be a great detriment at this time to the psychological development of the child if the strong bond with the custodian is interfered with.
5. Dr. Toomer testified that the child may develop psychological identity and cultural problems due to her mixed parentage if left with a white foster parent. A child of mixed parentage is identified by society as black. This Court finds that these problems do not outweigh the harm that would be occasioned by a change of custody.
It is thereupon
ORDERED and ADJUDGED that
The Maternal Uncle's Motion for Change of Custody is hereby DENIED.
[2] The child's white father has surrendered his parental interest. Her African-American mother's parental rights have been judicially terminated.
[3] (b) If diligent efforts are made to locate an adult relative willing and able to care for the child but, because no suitable relative is found, the child is placed with the department or a nonrelative custodian, both the department and the court shall consider transferring temporary legal custody to a willing adult relative or adult nonrelative approved by the court at a later date, but neither the department nor the court is obligated to so place the child if it is in the child's best interest to remain in the current placement. For the purposes of this paragraph, "diligent efforts to locate an adult relative" means a search similar to the diligent search for a parent, but without the continuing obligation to search after an initial adequate search is completed.

§ 39.41(4)(b), Fla.Stat. (Supp.1994).
[4] I have already indicated my general views of the value of this kind of evidence. See Regan v. Regan, 660 So.2d 1166, 1168-69 (Fla. 3d DCA 1995) (Schwartz, C.J., dissenting in part); Simms v. Department of Health & Rehabilitative Servs., 641 So.2d 957 (Fla. 3d DCA 1994) (Jorgenson, J., concurring in part and dissenting in part), review denied, 649 So.2d 870 (Fla.1994). One wonders whether much of this testimony could withstand a thoroughgoing application of the Frye test of scientific acceptability which controls the expert witness issue in Florida. See Hayes v. State, 660 So.2d 257 (Fla.1995); Flanagan v. State, 625 So.2d 827 (Fla.1993); see also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (disapproving expert testimony unsubstantiated by scientific method).
[5] I am troubled by the fact that the Department of Health and Rehabilitative Services has, contrary to the principles generally reflected in the controlling statutes, its own regulations and the position it has taken both judicially and publically in other similar instances, championed the interests of an unrelated foster parent over those of a qualified blood relative. It is true that the inconsistency is primarily a political matter and that it does not affect the issue of the welfare of this particular childwhich is the only one with which we are now properly concerned. I do say, however, for myself alone, that the disparate arguments presented by HRS in this court, cf. Reiter v. Department of Health & Rehabilitative Servs., 662 So.2d 942 (Fla. 3d DCA 1995) (table); Reiter v. J.S., 661 So.2d 836 (Fla. 3d DCA 1995) (table), and the unprincipled manner in which it has apparently determined which side it will favor, have caused me to distrust the reliability of any of its legal assertions in these cases.