WELLS, Judge.
 

 Ines Orta appeals from a final judgment of dissolution of marriage denying her petition to relocate to California with the parties’ minor child. For the following reasons, we reverse.
 

 The parties were married on October 9, 2002, in Caracas, Venezuela. The petitioner husband, Michael Suarez, then fifty-three years old, is a Florida resident and self-employed consulting engineer. The respondent wife, Ines Orta, then twenty-nine years old, is a Venezuelan educated dentist, who by virtue of her marriage to Suarez is a permanent resident.
 

 In 2006, Orta inherited approximately a half million dollars from her parents. Shortly thereafter, in June of 2007, the parties executed a post-nuptial agreement in which each waived both support from the other as well as the right to share in each other’s separate property. At the time this agreement was executed, Suarez swore under oath that his net worth was almost $23 million and that he had been and was then grossing, $8000 a month in income from his business as a consulting engineer. Orta on the other hand swore that she had a net worth a little shy of $500,000 and was grossing less than $600 a month in income.
 

 Although the parties lived in Suarez’ Miami Beach condominium following their marriage, they had always agreed to move to California, the only state in which Orta could practice dentistry without re-attending dental school. To this end, Orta and Suarez traveled to California a number of times looking for a place to live, staying weeks at a time so that Orta could study for and take California’s dentistry licensing examinations. But as the final judgment confirms, after Orta learned that she was pregnant, Suarez reneged on their deal and refused to move to California, thereby effectively stranding Orta in Florida where she could secure no meaningful work:
 

 [T]he credible evidence establishes that [Suarez and Orta] had in fact agreed to move to California so [Orta] could practice dentistry in California. The evi
 
 *990
 
 dence of this was clear and convincing, from the parties’ three separate trips to California (each for a period of 4-6 weeks), [Orta’s] taking of preparatory courses and sitting for the two parts of the exam, and the fact that the parties on their last trip actually looked for an area to live when they moved. While they put these plans on hold after [Orta] became pregnant, it was [Suarez] who changed his mind and refused to move to California. This left [Orta] in an untenable position. The only place she can practice dentistry in the United States (without going through dental school again) is California.
 

 This abrupt about face on Suarez’ part was not in the best interest of his child. In fact, as the final judgment acknowledges, Suarez never wanted children and let Orta know it “both in word and deed ... during the late stages of [Orta’s] pregnancy and immediately after [she] gave birth.” After the child was born, Suarez evidenced no concern as to what was in this child’s best interest and effectively refused to have anything to do with him:
 

 The credible evidence demonstrates [Suarez] did not want to have a child and his actions toward the end of the pregnancy, and immediately after the child’s birth, appears to reflect those feelings.
 

 [[Image here]]
 

 When the child was first born, [Suarez] would not allow the child to sleep in the parties’ bedroom or permit [Orta] to feed the child in the parties’ bedroom. [Suarez] complained that the child[’]s crying and waking up for feeding was affecting his sleep and therefore his work. [Orta] and child began sleeping in a separate bedroom. It is clear that, during the first months of the child’s life, [Orta] was the primary (and sometimes exclusive) parent....
 

 This all began to change when approximately four months after their child was born, Orta told Suarez that she wanted a divorce and asked him to leave the condominium where they lived. According to Orta, during a heated conversation on this subject, Suarez got upset, “grabbed her by the arm,” and threatened her when she attempted to walk away. She petitioned for a domestic violence injunction. In response, Suarez claimed that Orta’s petition was nothing more than an attempt to “abuse the system to gain a tactical advantage in a custody battle.” Orta denied any such motivation and testified without contradiction at the domestic violence hearing that Suarez had grabbed her by the arm, bruising and scratching her. The domestic violence judge, focusing primarily on who was entitled to Suarez’ condominium under the parties’ post-nuptial agreement — a matter not before the domestic violence court — concluded that Orta had not been battered and effectively pressured Orta into agreeing to vacate the condominium within a month.
 

 As “agreed,” Orta and her son moved out of Suarez’ condominium. But based on Suarez’ claim that he then was earning only $1600 a month rather than the $8000 a month he always had earned in the past, he was ordered to pay only $350 a month in child support to Orta. In addition, he picked up the cost of a nanny for the child. Thus, while Suarez continued to live in his $800,000 condominium, Orta and the parties’ son lived on less than $1200 a month derived from Orta’s salary of a little less than $800 a month and $350 a month in temporary child support.
 

 Despite the fact that as the trial court found “[Orta] was the primary (and sometimes exclusive) parent” of the parties’ child up to this time, Suarez now claimed
 
 under oath
 
 in his divorce petition to be a loving and devoted father. He also
 
 *991
 
 claimed that because Orta had “a history of depression and ... erratic behavior ... likely to have a negative effect on the minor child’s psychological and physical well being,” it was in this child’s best interest that the parties equally share custodianship. Claiming that Orta had threatened to abscond with their son to Venezuela, he also secured a temporary injunction preventing Orta from removing the child from Florida thereby trapping Orta in a place where she had no hope of earning enough money to adequately support herself and her son.
 

 In May of 2009, after an unsuccessful eight month search for a job in Florida, Orta finally received an offer to work as a dentist in Carlsbad, California at a salary of $108,000 a year. Orta sought leave of court to relocate with her son.
 

 Suarez objected with a vengeance. In a thirty-seven page sworn response, Suarez claimed, among many other things, that “[t]he petition for relocation ... is a
 
 sham”
 
 calculated “to separate [me] from [my] son” and to “destroy a loving father-son relationship.” He also claimed that Orta had sought to alienate him from his son “through the use of
 
 fraud, deceit,
 
 and
 
 abuse of process
 
 perpetrated through the legal system,” as purportedly evidenced by Orta’s
 
 “fraudulent domestic violence complaint
 
 ” which constituted “a
 
 felony in the State of Florida and an insidious form of child abuse
 
 ”; by Orta’s move to Plantation and then further away in Broward County after she vacated his condominium, a move which Suarez (ignoring the fact that Orta had less than $1200 a month on which to live) claimed was for no other purpose than to discourage “a loving father-son relationship”; and by Orta’s attempt to change the time sharing arrangement between herself and Suarez based on her claim that a nanny rather than Suarez was caring for the child when the child was with him.
 

 Suarez also claimed that relocation should be denied because Orta’s relocation request was nothing more than part of Orta’s plan to “eventually move back to ... Venezuela and permanently separate [Suarez] and [his] son.” This, according to Suarez, was evidenced by the fact that Orta had traveled to Venezuela over forty times during their marriage
 
 [1]
 
 and because she had told him shortly after she became pregnant that she wanted to return to Venezuela, causing him to fear that Orta would kidnap their son, “a horrendous crime and an insidious form of child abuse in which children are deeply and permanently affected.” Purportedly making matters even worse, Suarez claimed that Orta’s brother is “a physician who is a militant Chavez sympathizer” who has been offered a prominent position in the Chavez Government, and that her cousin is “married to the Chief of Police ... also a militant Chavez supporter.”
 

 Suarez further argued that relocation should be denied because 63% of youths from fatherless homes commit suicide, five times the average; 90% of homeless/runaway children are from fatherless homes, thirty two times the average; 85% of children with behavior disorders come from fatherless homes, twenty times the average; 80% of rapists come from fatherless homes, fourteen times the average; 71% of all high school drop outs come from fatherless homes, nine times the average; 75% of all teen drug abusers in rehab centers come from fatherless homes, ten times the average; 70% of youths in state operated institutions come from fatherless homes, nine times the average; and 85% of all
 
 *992
 
 youths in prison come from fatherless homes, twenty times the average, and that by moving to California, Orta was “determined to make the above statistics a reality in [his] son’s life.”
 

 He additionally claimed under oath that Orta was psychologically and emotionally unstable; that she had contracted a venereal disease and was morally unfit; that she had “refused to work or seek meaningful employment”; that their son preferred being with him
 
 “[a]s evidenced by numerous witnesses the child cries every tim,e the mother comes to pick him up after my timesharing and it is obvious that he rejects] the mother and does not want to go with the mother
 
 ”; and, that he had wanted this child more than just about anything and had been devoted to him long before and continually after his birth — a claim soundly rejected as not credible by the court below:
 

 My relationship with my son started at the moment of his conception. I am a devoted and loving father.... While my son was still in the womb of his mother I would talk to him so he could get familiar with my voice. I would play lullabies and classical music to sooth him with the illusion that he would soon be born and that I would be able to hold him in my arms....
 

 [[Image here]]
 

 Since I am a self-employed Engineer, in the weeks [that followed his birth] I readjusted my working schedule so I could spend the mornings with the baby at home and went to work at noon-time. I fed the baby every day before going to work. My wife was breast feeding and she would freeze her milk to use later to feed him.... I helped rock the baby to sleep on many occasions. I would get up in the middle of the night and help burp the baby at feeding time and did everything I could to give my unconditional love and support to my newborn son.
 

 (Suarez’ June 15, 2009, objection to Notice of Intent to Relocate.)
 

 When Orta sought to have her relocation request heard at a specially set hearing, Suarez objected, moving to strike thereby delaying action on the request. On July 15, two months after the request to relocate was filed, Orta’s request for a hearing on her relocation request was stricken. Nine days later, the relocation petition was referred to a general magistrate. Suarez objected again, further delaying resolution of Orta’s relocation request. By this time, all hope of securing an order permitting Orta and her son to move to California in time to take the job in Carlsbad was gone.
 

 On September 17, 2009, four months after making her initial request to relocate, Orta filed a second motion to relocate, this one nominated as an emergency, advising the court below that she had lost the first job offered to her because of the delay involved in securing permission to move and that she had secured another offer to commence work on or before October 5, 2009. Orta noticed a hearing on this relocation request for November 6, 2009. Suarez again moved to strike the hearing date and objected to relocation. The following week, on September 25, 2009, Orta notified the court that she had accepted a job offer in San Diego and with resolution of her relocation motions still unresolved, left for California leaving her son behind.
 

 On November 6, 2009, almost two months after Orta’s
 
 emergency
 
 motion to relocate was filed, the trial court denied Suarez’ motion to strike. The court did not resolve the relocation request, nor did it grant leave to temporarily relocate but sought instead to expedite by consolidating the proceedings. On December 8, 2009, almost three months after Orta filed her
 
 emergency
 
 request to relocate, the court
 
 *993
 
 below entered an order setting a final hearing of all matters during the last week of February 2010 or the first available week thereafter.
 

 No such final hearing took place. Almost two months later, on January 21, 2010, Suarez hired new counsel. Suarez’ new attorneys asked for “sixty ... to ninety days” to bring themselves up to speed and estimated that a one week period would be needed for the trial to follow. On that estimate, the matter was set for the week of April 19 through 22 — almost one full year after Orta initially asked to relocate and seven months after she sought relocation on an emergency basis.
 

 On May 18, 2010, a final judgment issued. That judgment confirmed that but for Orta’s move to California she would have been entitled to equal time with the child. However, based on a determination that it was not in the best interest of this two-year old to relocate to California, Suarez was awarded custodianship of the child and the lion’s share of the time with him:
 

 Should the Mother relocate to South Florida, the parties shall have equal timesharing....
 

 So long as the Mother remains in San Diego, California, and the child remains in Miami, the timesharing shall be as follows:
 

 [[Image here]]
 

 The child is scheduled to reside the majority of the time with the Father. The Father is designated as the “custodian” or “residential parent” of the child....
 

 Because the trial court’s findings confirm that Orta met her burden of proof for relocation with the child, we reverse.
 
 [2]
 

 Section 61.13001(7) of the Florida Statutes governing relocation requests expressly states that no “presümption in favor of or against a request to relocate with the child” arises simply because a “move will materially affect the current schedule of contact, access, and time-sharing with the nonrelocating parent” and that in determining whether to permit a requested relocation “the court shall evaluate all of the following” criteria:
 

 (a) The nature, quality, extent of involvement, and duration of the child’s relationship with the parent or other person proposing to relocate with the child and with the nonrelocating parent, other persons, siblings, half-siblings, and other significant persons in the child’s life.
 

 (b) The age and developmental stage of the child, the needs of the child, and the likely impact the relocation will have on the child’s physical, educational, and emotional development, taking into consideration any special needs of the child.
 

 (c) The feasibility of preserving the relationship between the nonrelocating parent or other person and the child through substitute arrangements that take into consideration the logistics of contact, access, and time-sharing, as well as the financial circumstances of the parties; whether those factors are sufficient to foster a continuing meaningful relationship between the child and the nonrelocating parent or other person;
 
 *994
 
 and the likelihood of compliance with the substitute arrangements by the relocating parent or other person once he or she is out of the jurisdiction of the court.
 

 (d) The child’s preference, taking into consideration the age and maturity of the child.
 

 (e) Whether the relocation will enhance the general quality of life for both the parent or other person seeking the relocation and the child, including, but not limited to, financial or emotional benefits or educational opportunities.
 

 (f) The reasons each parent or other person is seeking or opposing the relocation.
 

 (g) The current employment and economic circumstances of each parent or other person and whether the proposed relocation is necessary to improve the economic circumstances of the parent or other person seeking relocation of the child.
 

 (h) That the relocation is sought in good faith and the extent to which the objecting parent has fulfilled his or her financial obligations to the parent or other person seeking relocation, including child support, spousal support, and marital property and marital debt obligations.
 

 (i) The career and other opportunities available to the objecting parent or other person if the relocation occurs.
 

 (j) A history of substance abuse or domestic violence as defined in s. 741.28 or which meets the criteria of s. 39.806(l)(d) by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation.
 

 (k) Any other factor affecting the best interest of the child or as set forth in s. 61.13.
 

 § 61.13001(7), Fla. Stat. (2010).
 

 As the parent seeking relocation, Orta carried the burden of demonstrating that the relocation was in the child’s best interest, and the court’s findings of fact demonstrate that Orta more than satisfied that burden. Suarez on the other hand never demonstrated why the proposed relocation was not in the child’s best interest:
 

 Burden of proof. — The parent or other person wishing to relocate has the burden of proving by a preponderance of the evidence that relocation is in the best interest of the child. If that burden of proof is met, the burden shifts to the nonrelocating parent or other person to show by a preponderance of the evidence that the proposed relocation is not in the best interest of the child.
 

 § 61.13001(8), Fla. Stat. (2010). Indeed, virtually without exception, the trial court found each of the statutory factors either in equipoise or in favor of relocation.
 

 In that section of the final judgment addressing “Factors Bearing In Petition For Relocation,” as to the nature, quality, extent of involvement, and duration of the child’s relationship with the parent or other person proposing to relocate with the child and with the nonrelocating parent, other persons, siblings, half-siblings, and other significant persons in the child’s life, section 61.13001(7)(a), the court found that this child had enjoyed a close relationship with Orta from birth, that is, for the entirety of this two year-old’s life and that in the months after Orta relocated, the child also had developed a close and loving relationship with Suarez.
 

 As to the age and developmental stage of the child, the needs of the child, and the likely impact the relocation will have on the child’s physical, educational, and emotional development, taking into consideration any special needs of the child (section 61.13001(7)(b)), the trial court recognized that while some changes are inherent in any relocation no significant or permanent
 
 *995
 
 adverse impacts to relocating this child had been identified.
 

 No consideration was accorded by the court below to this child’s preference, given that he is only two years old.
 
 See
 
 § 61.13001(7)(d), Fla. Stat. (2010).
 

 As to a history of substance abuse or domestic violence, including consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation (section 61.13001(7)(j)), none was found.
 

 As to the remaining criteria, both the record and the final judgment itself confirm that relocation was surely in the best interest of this child.
 
 See
 
 § 61.13001(7)(e), Fla. Stat. (2010) (requiring the court below to consider “[wjhether relocation will enhance the general quality of life for both the parent ... seeking relocation and the child,
 
 including, but not limited to, financial ... benefits ”)
 
 (emphasis added); § 61.13001(7)(f), Fla. Stat. (2010) (requiring the court below to consider the “reasons each parent ... is seeking ... relocation”); § 61.13001(7)(g), Fla. Stat. (2010) (requiring the court below to consider the “current employment and economic circumstances of each parent and whether the proposed
 
 relocation is necessary to improve the economic circumstances of the parent ... seeking relocation of the child
 
 ”) (emphasis added); § 61.13001(7)(h), Fla. Stat. (2010) (requiring the court below to consider whether “the relocation is sought in good faith and the extent to which the objecting parent has fulfilled his or her financial obligation to the parent ... seeking relocation, including child support”); § 61.13001(7)(i), Fla. Stat. (2010) (requiring the court below to consider the “career and other opportunities available to the objecting parent ... if the relocation occurs”).
 

 As the record confirms, Orta is a Venezuelan-educated dentist who could work only in California without re-attending dental school. As a consequence Suarez always had agreed to move with her to California so that she could work. But after Orta got pregnant and then demanded a divorce, Suarez, a self-employed engineer who up to that time saw no impediment to moving his business to California, reneged on his agreement making it impossible for Orta to find meaningful employment. With a post-nuptial agreement in hand in which Orta waived support for herself, Suarez took the position that he could not move his business to California and misrepresented his income as being only $1600 per month, rather than the $8000 per month he had always earned in the past. This left Orta stranded here with her son with less than $800 a month in income and $350 a month in child support, and left her no choice but to seek and to take employment in California, the only place she could earn a living to support herself and her son. On these facts alone relocation should have been granted. Additionally, when it became apparent to Suarez immediately before the final hearing that he would have to show that he could support this child as well as Orta now could, he suddenly showed an income of $8000 per month, rather than the paltry $1600 he had been claiming.
 

 We need look no further than the final judgment itself to confirm both these facts and that based on them relocation should have been granted:
 

 As between the two parties, the Father clearly has the more flexible work schedule. But the Father found himself in a quandary: he needed to acknowledge a schedule which was flexible enough to enable him to travel often to California (for the Mother to timeshare on a regular and extended basis with the child) but could not acknowledge having a business or clientele so flexible that he could himself relocate to California.
 

 
 *996
 
 [[Image here]]
 

 As a practical matter, California is the only state in the United States where [the Mother] can currently practice dentistry. The Father claimed that the Mother could work in Miami as a dental hygienist. The evidence does not support this claim, given the Mother’s evidence of injury (and worker’s compensation claim) that prevents her from working as a dental hygienist. Even if the Mother could work as a dental hygienist (which this Court finds is not supported by the credible evidence), the Mother has significantly more opportunities and greater upside income potential as a practicing dentist. The financial opportunities for the Mother are significantly greater in California than in Florida.
 

 [[Image here]]
 

 The Court finds that the Mother’s relocation [request] was made in good faith, and her request for the relocation of the minor child was also made in good faith. As discussed earlier, the Mother’s move to California to practice dentistry was pursuant to a plan and agreement between the Father and Mother, prior to the child’s birth. The Father’s testimony was inconsistent at best in this regard and was generally not credible. The Father’s claim that it was the Mother, and not the Father, who “changed her mind”, is not believable given the other testimony and evidence in the case. The move by the Mother to California is certainly necessary for her to continue her career as a dentist.
 

 This is perhaps the greatest inequity in the case. In terms of equity between the Father and the Mother, the Court finds that the Father and Mother in fact had an agreement to move to California so the Mother could continue her career as a dentist. The Mother acted upon this agreement, studying, preparing for and taking the exam so that she could be properly licensed in California. The Mother relied to her detriment on the agreement, and when the Father changed his mind (unreasonably, this Court concludes) the Mother was left with the Hobson’s choice of staying in Miami with her child but without any chance of practicing dentistry (without going back to school) or move to California where she had a good job offer, continue her career in dentistry, and hope that the child could relocate to California (either by the Father’s agreement to do so or by court order).
 

 Despite these determinations, the court below, citing to section 61.13001(T)(c), inconsistently concluded that “the Court believes that the best interests of the child are currently served by the child remaining in Miami and following a timesharing plan as set forth in this Final Judgment, as least given the parent’s respective work schedule and relative flexibility, and given the child’s current school schedule, age, and developmental stage.” Section 61.13001(7)(c) deals with (1) whether substitute visitation arrangements may be made taking “into consideration the logistics of contact, access, and time sharing, as well as the financial circumstances of the parties” so that a meaningful relationship between the non-relocating parent and the child may be fostered and preserved and (2) whether the relocating parent is likely to comply with substitute arrangements after relocation. As to these considerations, the record and the final judgment confirms that Suarez’ work schedule is flexible while Orta’s is not, which allows Suarez more latitude for visiting with this child both in Miami and in California:
 

 The Father lives in Miami, while the mother lives in San Diego. Given the flexible schedule of the Father, he has the ability to travel to San Diego with much greater frequency than the Mother’s ability to travel from San Diego to
 
 *997
 
 Miami. This factor would seem to weigh in the Mother’s favor; if the child remains with the Father in Miami, the Mother would have a limited ability to travel to Miami to exercise timesharing with the child.
 

 The record and final judgment also confirm that both parties are financially and otherwise capable of time-sharing despite the distances involved in this case and that both parties are capable of and have successfully been complying with substitute arrangements for bi-coastal visitation. Thus, as to section 61.13001(7)(c), the court’s findings provide no barrier to the move sought, and the balance of the court’s findings as to each of the factors identified in section 61.13001(7) overwhelmingly supported granting the motion for relocation.
 

 Moreover, the findings of fact contained in the “parenting plan” portion of the order likewise support the conclusion that the move was in the child’s best interests. Before the court was the concurrent request for a “parenting plan” under section 61.13(3) of the Florida Statutes. In its order, the court tackled the parenting plan first but
 
 specifically found that its findings of fact were applicable to both issues.
 
 Considering the provisions of section 61.13(3), the court found a number of the enumerated factors as between the parties to be in equipoise; the balance however weighed heavily in favor of the child’s move.
 

 The court’s findings as related to section 61.13(3)(a), “[t]he demonstrated capacity and disposition of each parent to facilitate and encourage a close and continuing parent-child relationship, to honor the time-sharing schedule, and to be reasonable when changes are required,” are directly applicable to section 61.13001(7)(c), and demonstrate that it was Orta who was the parent who would best “foster a continuing meaningful relationship between the child and the nonrelocating parent.” While both parties were fairly good at time sharing, Orta was the parent who most consistently fostered a close relationship between the other parent and the parties’ child, this despite circumstances which might have encouraged her to act otherwise:
 

 The Mother testified, and this Court finds credible, that the Father did not want children and expressed those feelings both in word and deed toward the Mother during the late stages of the pregnancy and immediately after the Mother gave birth to the child. When the child was first born, the Father would not allow the child to sleep in the parties’ bedroom or permit the Mother to feed the child in the parties’ bedroom. The Father complained that the child’s crying and waking up for feeding was affecting his sleep and therefore his work. The Mother and child began sleeping in a separate bedroom. It is clear that, during the first months of the child’s life, the Mother was the primary (and sometimes exclusive) parent: During this time (and in fact throughout the child’s life) the Mother has demonstrated a significant capacity and disposition to facilitate and encourage a close and continuing parent-child relationship between herself and her child.
 
 The Mother has also demonstrated a capacity and disposition to encourage such a relationship between the child and his Father.
 

 (Emphasis added). No similar capacity and disposition was found as to Suarez. The court below also rejected as not credible Suarez’ claim that Orta had attempted to thwart his relationship with his son:
 

 The Father’s capacity and disposition to facilitate and encourage a close and continuing parent-child relationship during the early months of the child’s life was
 
 *998
 
 not nearly as significant. The Father’s claims that the Mother attempted to prevent or thwart the Father’s participation in the care of the child after his birth are not credible or supported by credible evidence.
 

 The court’s findings addressing section 61.13(3)(c), “[t]he demonstrated capacity and disposition of each parent to determine, consider, and act upon the needs of the child as opposed to the needs or desires of the parent,” again directly support the conclusion that under section 61.13001(3)(a), Orta carried her burden of showing the move was in the child’s best interest considering the “quality, extent of involvement, and duration of the child’s relationship with the parent or other person proposing to relocate with the child and with the nonrelocating parent.” The trial court found that at all times Orta put the needs of her child ahead of her own, whereas, Suarez always had put his needs and desires above those of his child:
 

 The credible evidence leads this Court to conclude that, in the months after the child was born, the Mother clearly demonstrated a capacity and disposition to determine, consider and act upon the needs of the child as opposed to the needs or desires of the parent.
 

 One of the contested issues was the Mother’s move to California, and what prompted it. The Father contended that he and the Mother never had an agreement to move to California. It was implied by the Father, if not expressed, that the Mother’s decision to move to California demonstrates selfishness on her part, or at least a desire to place her needs or, desires over the needs or desires of the child.
 

 However, the credible evidence establishes that the Mother and Father had in fact agreed to move to California so the Mother could practice dentistry in California. The evidence of this was clear and convincing, from the parties’ three separate trips to California (each for a period of 4-6 weeks), the Mother’s taking of preparatory courses and sitting for the two parts of the exam, and the fact that the parties on their last trip actually looked for an area to live when they moved. While they put these plans on hold after the Mother became pregnant, it was the Father who changed his mind and refused to move to California. This left the Mother in an untenable position. The only place she can practice dentistry in the United States (without going through dental school again) is California.
 
 As between the parties, it was the Father, not the Mother, who acted in his own self-interest.
 

 As described earlier, the Father demonstrated little capacity and disposition to determine, consider and act upon the needs of the child as opposed to his own needs and desires, at least during the pregnancy and immediately following the birth of the child. The credible evidence demonstrates that the Father did not want to have a child and his actions toward the end of the pregnancy, and immediately after the child’s birth, appears to reflect those feelings.
 

 (Emphasis added).
 

 Additionally while the trial court found no evidence that either parent knowingly provided false information of domestic abuse, when addressing section 61.13(3)(n), relevant to section 61.13001(7)(j), it did conclude that Suarez had engaged in emotional abuse:
 

 Judge Karan did state on the record that she did not believe there was evidence that the Father was “a batterer.” This Court is likewise unconvinced that the credible evidence establishes that the Father committed an act of physical violence upon the Mother. While there may have been one or more physical
 
 *999
 
 confrontations between the parties, the Court is unable to determine with any degree of confidence what happened during those confrontations.
 

 However, domestic abuse can occur in many ways, physical violence being only one. Emotional abuse, while leaving no visible scars, can often produce lasting injury.
 
 The Court concludes that the credible evidence establishes that the Father, during the late stages of the Mother’s pregnancg, and immediately after birth of the child, engaged in acts which can fairly be characterized as emotional abuse, though not rising to the level of domestic violence.
 
 While this conduct cannot ever be condoned, the Court believes this conduct was short-lived and there is no evidence that such conduct has continued or is likely to continue, or that this conduct had any effect upon the child.
 

 (Emphasis added).
 
 [3]
 
 This can hardly be said to redound in favor of the child remaining in Miami.
 

 Again addressing the parenting tasks undertaken by each parent and their reliance on third party caregivers under section 61.13(3)(o),
 
 [4]
 
 but also directly applicable to section 61.13001(7)(a), the final judgment confirms that before litigation began Orta was the sole caregiver but after she had to move to California, Suarez has cared for this child, but only with a significant and worrisome reliance on third parties:
 

 The Court finds not credible the testimony of the nanny and Father regarding the reasons why the nanny traveled with the Father and child to California during the Mother’s timesharing. The reason given (the Father was suffering from a cold and did not want the child to get sick) was inconsistent with the nanny and Father’s other testimony about the Father’s activities with the child (during which the child would be exposed to the Father and his alleged ailment). The Court concludes that the reason the nanny came with the Father during the trip to California was for the nanny to assist in caring for the child.
 
 This causes the Court some concern whether the Father is being entirely truthful regarding the extent to which the nanny has undertaken parenting responsibilities during the litigation and the extent to which she will be called upon to do so in the future.
 

 (Emphasis added).
 

 The trial court also determined that Suarez’ claim that he spent considerable time with this child was undercut by a video showing a nanny caring for the child on a specific day on which Suarez claimed that he was the caregiver:
 

 The video did, however, contradict the Father’s prior testimony (given in a deposition) that he had spent a specific afternoon with his child at the pool. It is clear from the video that, on the day in question, the Father was not with the
 
 *1000
 
 child at the pool for any part of the afternoon. The Mother argued this contradiction was significant because the Father has maintained that he spends a considerable amount of each day with the child; this video, on at least this one occasion, undercuts the Father’s claim.
 

 The importance to be attached to the parties’ own pre-litigation division of labor is stressed not only in section 61.13(3)(o), but in our case law as well. This court in
 
 Young v. Hector,
 
 740 So.2d 1153, 1163 (Fla. 3d DCA 1998) (en banc), recognized, it is not who has the child last or who may most conveniently care for a child that controls with whom a child should best live:
 

 In its determination as to the best interests of the minor children, the trial court obviously deemed it more important to assess the children’s time spent with each of the parents throughout the course of the marriage and not merely focus on the years immediately preceding the announcement of the dissolution action.
 
 That is, the trial court, in an effort to maintain continuity, could have legitimately determined that the children’s best interests dictate that they remain with the parent who had continuously been there to care for their needs throughout their young lives rather than the parent who had devoted a substantial amount of time with them perhaps only when it was convenient and/or opportunistic to do so.
 

 (Emphasis added). Thus, as Judge Schwartz states in his dissent in that case, most persuasive of what should occur
 
 post-litigation
 
 is the parties’ own
 
 pre-litigation
 
 arrangement, i.e. the parent who consistently cared for a child for most of his or her life:
 

 [T]he childrens’ parents, who know and care most about their welfare, had themselves established an arrangement prior to the dissolution as a part of which, upon any fair assessment, [Young] was the primary caretaker. See Principles of the Law of Family Dissolution: Analysis and Recommendations (Am. Law Inst.1998)(Tentative Draft No. 3, Part I) § 2.03(6). ... There is simply no reason for a court to tamper with what has worked so well. See Principles of the Law of Family Dissolution: Analysis and Recommendations (Am. Law Inst.1998) (Tentative Draft No. 3, Part I) § 2.09(1). This is not only because it is almost always better to preserve a known good rather than to risk what the unknown future may bring, see
 
 Rumph v. V.D.,
 
 667 So.2d 998, 998 (Fla. 3d DCA 1996)(Schwartz, C.J., specially concurring), but, much more important, because the children are themselves entitled to stability in their lives and routine[.]
 

 Id.,
 
 at 1172-73 (Schwartz, J., dissenting) (footnotes omitted).
 

 In this case, the pre-litigation primary caregiver indisputably was Orta. It was only by virtue of Suarez’ refusal to relocate as agreed; his misrepresentation of his income; and his tactics in delaying resolution of Orta’s relocation requests, that this arrangement changed. As the final judgment confirms, but for Suarez’ actions, this child would have been with his mother:
 
 [5]
 

 
 *1001
 
 This is perhaps the greatest inequity in the case. In terms of equity between the Father and the Mother, the Court finds that the Father and Mother in fact had an agreement to move to California so the Mother could continue her career as a dentist. The Mother acted upon this agreement, studying, preparing for and taking the exam so that she could be properly licensed in California. The Mother relied to her detriment on the agreement, and when the Father changed his mind (unreasonably, this Court concludes) the Mother was left with the Hobson’s choice of staying in Miami with her child but without any chance of practicing dentistry (without going back to school) or move to California where she had a good job offer, continue her career in dentistry, and hope that the child could relocate to California (either by the Father’s agreement to do so or by court order). Were the Court to decide ... based upon the equities between the parents, this decision would be a relatively easy one. However, the decision must ultimately rest upon a determination of the best interest of the child.
 

 Ultimately, the trial judge devised its parenting plan relying chiefly on a determination not to ‘upset the apple cart’ that the father himself in good measure had created:
 

 [Tjhere can be little doubt that a relocation from Miami to San Diego would result in some impact on the child, even if temporary and insignificant. He would have to acclimate to a new daily routine and schedule, become accustomed to a new home and surroundings, and adjust to the fact that he would not see his Father on is daily basis. These are the inevitable changes with most relocations, of course, but cannot be ignored.
 

 Of course, acclimating to a new daily routine and schedule, becoming accustomed to a new home and surroundings, and adjusting to no longer being with the parent with whom the child previously lived, are inherent in every relocation, and again exactly the type of consideration that section 61.13001(7), expressly directs should not be determinative in considering a contested motion for relocation.
 
 [6]
 

 See Miller v.
 
 
 *1002
 

 Miller,
 
 992 So.2d 346, 349 (Fla. 3d DCA 2008) (rejecting the trial courts reliance as a basis for denial of relocation on the stress and disruption to the child caused by the divorce and long-distance separation).
 

 In sum, the trial court’s findings of fact addressing both sections 61.13(3) and 61.13001(7), confirm that Orta more than carried her burden of proving that relocation to California was in this child’s best. By contrast, Suarez failed to show by a preponderance of the evidence that the proposed relocation was not in the child’s best interest. Absent such a showing, the trial court should have granted Orta’s motion for relocation and devised a parenting plan in accordance with that ruling.
 
 See
 
 § 61.13001(8), Fla. Stat. (2010);
 
 Miller,
 
 992 So.2d at 349 (confirming that once the parent seeking to relocate meets his/her initial burden, the burden shifts to the non-relocating parent to show by a preponderance of the evidence that the proposed relocation is not in the child’s best interest).
 

 Accordingly, that portion of the final judgment denying Orta’s relocation request is reversed and remanded to allow relocation forthwith and to devise a parenting/time sharing plan predicated on this.
 

 CORTIÑAS, J., concurs in result only.
 

 [1]
 

 . Orta testified that during the first three years of the marriage she travelled frequently to Venezuela first while her mother was terminally ill, and then when her father became terminally ill.
 

 [2]
 

 . We acknowledge the limited standard of review applicable to such orders.
 
 See Crombie v. Williams,
 
 51 So.3d 559, 560 (Fla. 3d DCA 2010) ("We find no abuse of discretion in the trial judge's decision that staying in South Florida was in the child's best interest and denying relocation.”);
 
 Young v. Hector,
 
 740 So.2d 1153, 1157 (Fla. 3d DCA 1998) (" 'A trial court’s determination of custody "is subject to an abuse of discretion standard of review.'
 
 Sullivan v. Sullivan,
 
 668 So.2d 329, 330 (Fla. 4th DCA 1996) (citing
 
 Canakaris v. Canakaris,
 
 382 So.2d 1197 (Fla.1980))”); acc
 
 ord Beharry v. Drake,
 
 52 So.3d 790, 793 (Fla. 5th DCA 2010).
 

 [3]
 

 . The trial court did not otherwise address section 61.13(3)(m), which provides for consideration of:
 

 (m) Evidence of domestic violence, sexual violence, child abuse, child abandonment, or child neglect, regardless of whether a prior or pending action relating to those issues has been brought. If the court accepts evidence of prior or pending actions regarding domestic violence, sexual violence, child abuse, child abandonment, or child neglect, the court must specifically acknowledge in writing that such evidence was considered when evaluating the best interests of the child.
 

 [4]
 

 . Section 61.13(3)(o), provides for consideration of:
 

 The particular parenting tasks customarily performed by each parent and the division of parental responsibilities before the institution of litigation and during the pending litigation, including the extent to which parenting responsibilities were undertaken by third parties.
 

 [5]
 

 . The outcome below perhaps best explains why it is imperative that relocation motions be addressed at the earliest opportunity and why section 61.13001 provides for temporary relocations. Section 61.13001(6), Florida Statutes (2010) provides:
 

 (6) Temporary order.-
 

 [[Image here]]
 

 (b) The court may grant a temporary order permitting the relocation of the child pending final hearing, if the court finds:
 

 1. That the petition to relocate was properly filed and is otherwise in compliance with subsection (3) [a petition to relocate has been filed in compliance with the statute and served upon the other parent]; and
 

 
 *1001
 
 2. From an examination of the evidence presented at the preliminary hearing, that there is a likelihood that on final hearing the court will approve the relocation of the child, which findings must be supported by the same factual basis as would be necessary to support approving the relocation in a final judgment.
 

 (c) If the court has issued a temporary order authorizing a party seeking to relocate or move a child before a final judgment is rendered, the court may not give any weight to the temporaiy relocation as a factor in reaching its final decision.
 

 (d) If temporary relocation of a child is approved, the court may require the person relocating the child to provide reasonable security, financial or otherwise, and guarantee that the court-ordered contact with the child will not be interrupted or interfered with by the relocating party.
 

 (Emphasis added). The importance to be accorded the parties' pre-litigation actions also is acknowledged by section 63.13001(6)(c)’s provision that events occurring after a prejudgment relocation has taken place are not to be accorded any weight in the final determination. Here, circumstances arising after litigation was initiated certainly drove the decision.
 
 See generally Mian v. Mian,
 
 775 So.2d 357, 358 (Fla. 2d DCA 2000) ("[I]t is necessary for a trial judge to consider the relocation factors at the earliest opportunity because of the wide-ranging and intense ramifications that moving can have upon the best interest of the child.”);
 
 accord Shafer v. Shafer,
 
 898 So.2d 1053, 1057 (Fla. 4th DCA 2005).
 

 [6]
 

 . Section 61.13001, provides:
 

 (7) No presumption; factors to determine contested relocation. — A presumption in favor of or against a request to relocate with the child does not arise if a parent or other person seeks to relocate and the move will materially affect the current schedule of
 
 *1002
 
 contact, access, and time-sharing with the nonrelocating parent or other person.